# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued May 9, 2005           Decided July 29, 2005

No. 04-7159

JOHN W. PETERSON,
ON BEHALF OF HIMSELF AND OTHERS SIMILARLY SITUATED,
APPELLANT

v.

THE ROYAL KINGDOM OF SAUDI ARABIA AND
GENERAL ORGANIZATION OF SOCIAL INSURANCE,
AN INSTRUMENTALITY OF THE KINGDOM OF SAUDI ARABIA,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 03cv01771)

---

*Stephen A. Saltzburg* argued the cause for the appellant. *Eric L. Siegel* was on brief.

*B. Thomas Peele, III* argued the cause for the appellees. *John F. Hundley* entered an appearance.

Before: EDWARDS, HENDERSON and TATEL, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: John Peterson sued the Royal Kingdom of Saudi Arabia and one of its agencies, the General Organization of Social Insurance

(collectively, Saudi Arabia), seeking to recover mandatory contributions his employers made to a retirement program. Finding no exception in the Foreign Sovereign Immunities Act (FSIA or Act), 28 U.S.C. §§ 1602 *et seq.*, applicable to Peterson's claims, the district court dismissed his law suit for lack of jurisdiction. *See Peterson v. Royal Kingdom of Saudi Arabia*, 332 F. Supp. 2d 189 (D.D.C. 2004), *reprinted in* Joint Appendix (J.A.) at 342-58. He now appeals, arguing that Saudi Arabia is not entitled to sovereign immunity because the FSIA's "expropriation" and "commercial activity" exceptions apply to the claims he presses. Neither exception applies, we conclude, and thus there is no basis for federal court jurisdiction over Saudi Arabia for the purpose of Peterson's suit. We therefore affirm the district court's judgment.

## I.

We accept as true the facts Peterson alleges in his complaint and briefly recount them now.[1] In November 1969, Saudi Arabia established the General Organization of Social Insurance (GOSI) by Royal Decree "to promote foreign commerce and attract badly needed foreign workers to Saudi Arabia." J.A. 3-4. GOSI has two distinct branches: the Occupational Hazards Branch, which provides insurance coverage for employment-related injuries, and the Annuities Branch, which provides retirement and death benefits.

From 1969 until 1987, Saudi Arabia required employers and their employees, regardless of national origin or citizenship, to make contributions to GOSI. Employers were required to contribute two per cent of their employees' salaries to the

---

[1] *See Saudi Arabia v. Nelson*, 507 U.S. 349, 351 (1993) ("Because this case comes to us on a motion to dismiss the complaint, we assume that we have truthful factual allegations before us though many of those allegations are subject to dispute." (internal citation omitted)); *accord World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1157 n.2 (D.C. Cir. 2002).

Occupational Hazards Branch. Each employer and each employee were responsible for contributing "thirteen . . . percent of the total value of the employee's wages and other benefits" to the Annuities Branch, the employer contributing eight-per cent and the employee the remaining five per cent. J.A. 6. "All contributions," however, "were made for the benefit of, and in the name of, the employee." J.A. 6. GOSI invested the contributions it received in domestic corporations and organizations as well as international banks.

In 1987 Saudi Arabia issued Royal Decree No. M/43, "which excluded non-Saudi workers from GOSI's Annuit[ies] Branch." J.A. 6. The upshot of the Royal Decree was that non-Saudi workers were no longer eligible for retirement and death benefits. At some point between 1987 and 1990, however, Saudi Arabia decided to refund to non-Saudi workers a portion of the contributions made to the Annuities Branch in their names. Peterson, who had worked for multiple engineering and construction companies in Saudi Arabia from 1979 to 1990 and made contributions to GOSI, applied for and eventually received in 1988 a refund of the five per cent contribution he made to the Annuities Branch. Along with his refund check, Peterson received the following notice: "Attached is a check for the value of your entitlements, due to you as per the applicable rules for this purpose. This payment represents your full dues from GOSI." J.A. 22.

Peterson alleges that Saudi Arabia failed to publicize the refund program, failed to explain its decision to refund only five per cent of the contributions made in his name and failed to "state when the remaining eight percent would be paid." J.A. 9. Throughout June 2003, Peterson contacted the Saudi Arabian Embassy in Washington, D.C., by telephone, by mail and by facsimile to ask for a date certain by which he would receive the remaining eight-per cent contribution his employers made in his name. Peterson notified the embassy that he would give Saudi

Arabia until June 23, 2003 to answer his inquiry and that he would deem its failure to respond a constructive denial of his request. He received no answer.

Peterson then sued Saudi Arabia in the district court on August 21, 2003. His complaint alleges four claims based on Saudi Arabia's failure to refund the full amount paid into the GOSI Annuities Branch in his behalf: (1) arbitrary and discriminatory expropriation of his property in violation of international law; (2) breach of contract; (3) conversion of his property; and (4) unjust enrichment. Saudi Arabia subsequently filed a motion to dismiss, which the district court granted on August 23, 2004. *See Peterson*, 332 F. Supp. 2d at 202.

The district court concluded that it lacked jurisdiction to entertain Peterson's suit under FSIA because his claims failed to meet the Act's "expropriation" or "commercial activity" exceptions. *See id.* at 196-201. With respect to the "expropriation" exception, the district court concluded that "the eight percent GOSI contribution, characterized by the plaintiff as an expectation interest in payments, does not qualify as a right in tangible property and the expropriation exception does not apply here for that reason." *Id.* at 197. "The fact that the property in question is not 'tangible' property is," it explained, "dispositive of the question whether the expropriation exception of the FSIA can apply to defendants." *Id.* at 198. Turning to FSIA's "commercial activity" exception, the district court found it inapplicable as well because "[t]he termination of GOSI benefits for foreign workers is a sovereign, not a commercial, act and the termination cannot be understood to have had a 'direct effect' in the United States." *Id.* at 201 (quoting 28 U.S.C. § 1605(a)(2)). The termination was "distinctly sovereign," to the court's mind, because "a private player in the market certainly could not engage in the particular actions of initiating, administering, and ending a scheme of mandatory social insurance." *Id.* at 200 (internal quotation marks omitted).

And there was no "direct" effect in the United States, the court explained, because "[b]ased on the record before the Court, it appears that, to the extent Peterson expected a refund of his GOSI contributions in a particular place, it can at most be described as an implied agreement for payment in the United States." *Id.* at 201. In the alternative, the district court further concluded that Peterson's claims were "barred under any applicable statute of limitations." *Id.*

He now appeals. *See* 28 U.S.C. § 1291. On *de novo* review, we affirm the judgment of the district court, *see Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1168 (D.C. Cir. 1994) (foreign government's entitlement to sovereign immunity is question of law subject to *de novo* review), *cert. denied,* 513 U.S. 1121 (1995), as set forth below.

## II.

In the United States, there is only one way for a court to obtain jurisdiction over a foreign state and it is not a particularly generous one—the FSIA. *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989) ("[T]he FSIA provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country . . . ."); *accord World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1161 (D.C. Cir. 2002). FSIA provides that a district court has jurisdiction over a civil action against a foreign sovereign for any claim "with respect to which the foreign state is not entitled to immunity." 28 U.S.C. § 1330(a); *see World Wide Minerals, Ltd.*, 296 F.3d at 1161. But under the Act, a foreign state is immune from the jurisdiction of federal and state courts alike, *see* 28 U.S.C. § 1330(a); *id.* § 1604, and remains so unless an international agreement, *see id.* §§ 1330(a), 1604, or one of several exceptions in the statute provides otherwise, *see id.* §§ 1605, 1607. *See Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000). In the absence of an applicable exception, the foreign sovereign's immunity is

"complete"—"[t]he district court lacks subject matter jurisdiction over the plaintiff's case." *Id.* (citation omitted); *see also Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) ("[U]nless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." (citations omitted)). Peterson maintains that Saudi Arabia is not entitled to sovereign immunity under either of two FSIA exceptions—the "expropriation" exception or the "commercial activity" one. We conclude neither applies.

Peterson first maintains that Saudi Arabia is not entitled to sovereign immunity because it arbitrarily and discriminatorily expropriated his property in violation of international law. Under FSIA,

> [a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.

28 U.S.C. § 1605(a)(3). Thus, for a claim to fit within this statutory exception, it must meet three requirements: At issue must be (1) "rights in property" that (2) were taken in violation of international law and (3) the property at issue (or any property exchanged for it) must either (a) be present in the United States "in connection with a commercial activity carried on in the United States by the foreign state" or (b) "owned or

operated by an agency or instrumentality of the foreign state and that agency or instrumentality" engages in commercial activity in the United States. *Id.* Our analysis begins and ends with the exception's first two requirements. *See id.*

The parties make assorted arguments regarding whether the eight-per cent GOSI contributions made by Peterson's employers on his behalf constitute a "right[] in property"—*i.e.*, the parties dispute whether the eight-per cent contribution constitutes property at all, what kind of property it is—tangible or intangible—and, if it is property, to whom it in fact belongs. They direct most of their attention to the question whether the employers' GOSI contributions constitute tangible or intangible property. Saudi Arabia contends that FSIA's expropriation exception encompasses only tangible property (such as physical assets), not intangible property (such as a right to receive payment), and therefore does not apply to Peterson's employers' GOSI contributions, which it characterizes as securing an "[e]xpectation interest[] in social insurance benefits." *See* Appellees' Br. at 14. Peterson disagrees, arguing that such a cramped interpretation is "shortsighted, overly formalistic and contradicts Congressional intent," Appellant's Br. at 12, and that his employers' GOSI contributions constitute tangible property in any event.

The parties' focus on this question is not surprising inasmuch as the district court found the question pivotal, as have other district courts. Some courts have held that the term "property" as used in FSIA's expropriation exception "means physical property not the right to receive payment." *Lord Day & Lord v. Socialist Republic of Vietnam*, 134 F. Supp. 2d 549, 560 (S.D.N.Y. 2001) (internal quotation marks & citations omitted) (expropriation exception inapplicable because claim based on entitlement to funds was "fatally flawed"); *accord, e.g., Sampson v. Fed. Republic of Germany*, 975 F. Supp. 1108, 1117 (N.D. Ill. 1997) (expropriation exception inapplicable to claim

not involving "loss of tangible property" because "property under this section refers to tangible property" (internal quotation marks & citation omitted)), *aff'd*, 250 F.3d 1145 (7th Cir. 2001); *Intercontinental Dictionary Series v. De Gruyter*, 822 F. Supp. 662, 678 (C.D. Cal. 1993) ("intangible intellectual property rights or the right to receive payment on a contract alleged by IDS are not grounds for applying the [expropriation] exception"); *Canadian Overseas Ores Ltd. v. Compania de Acero del Pacifico S.A.*, 528 F. Supp. 1337, 1346 (S.D.N.Y. 1982) (expropriation exception inapplicable to breach of contract claim because it "is on its face inapplicable to a contractual right to be paid"), *aff'd*, 727 F.2d 274 (2d Cir. 1984); *see generally De Sanchez v. Banco Cent. de Nicaragua*, 770 F. 2d 1385, 1395 (5th Cir. 1985) (declining to decide issue but citing cases); *cf. Hirsh v. State of Israel*, 962 F. Supp. 377, 383 (S.D.N.Y. 1997) (assuming reparation payments were expropriated, exception "nevertheless . . . inapplicable, as it has been interpreted to apply only to the expropriation of tangible property, not to the right to receive payments"). In fact, this case is not the only instance in which our Circuit's district court has analyzed the tangible/intangible distinction in assessing subject matter jurisdiction under FSIA's expropriation exception. *See Rong v. Liaoning Provincial Gov't*, 362 F. Supp. 2d 83, 101 (D.D.C. 2005) ("[T]he FSIA applies where the property at issue is tangible property." (internal quotation marks & citation omitted)). Arguing against this precedent, Peterson relies on a Ninth Circuit decision construing the Second Hickenlooper Amendment, 22 U.S.C. § 2370(e)(2),[2] in which

---

[2] The Second Hickenlooper Amendment constitutes the Congress's response to the United States Supreme Court's decision in *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964), which held an expropriation claim barred by the act of state doctrine. *See id.* at 428 ("[W]e decide only that the Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government . . . even if the complaint alleges that the taking

the court observed that "the tangible/intangible characterization of property interests . . . is a distinction without a difference." *West v. Multibanco Comermex, S.A.*, 807 F.2d 820, 830 (9th Cir. 1987). For our part, we have not decided the question and need not do so today.

Regardless whether the eight-per cent GOSI contributions constitute tangible or intangible property or what significance, if any, the latter classification may carry under FSIA's expropriation exception, 28 U.S.C. § 1605(a)(3), Peterson has failed to allege sufficient facts demonstrating that the contributions constitute a "right[] in property" in the first place. Peterson maintains that his "substantial cash investments in GOSI" constitute tangible property. Complaint at 13, ¶ 58, *reprinted in* J.A. at 13. But his contributions were not placed in a private account in his name; rather, if GOSI had remained in force with respect to foreign workers, the contributions Peterson (and his employers) made would have been returned to him in the form of an annuity upon his retirement at age 60, provided he met certain conditions. *See* J.A. 216-17. The annuity, moreover, would not have been based on his five-per cent and

---

violates customary international law."). The Second Hickenlooper Amendment provides in part:

> [N]o court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which a claim of title or other right to property is asserted by any party including a foreign state (or a party claiming through such state) based upon (or traced through) a confiscation or other taking . . . by an act of that state in violation of the principles of international law, including the principles of compensation . . . .

22 U.S.C. § 2370(e)(2).

his employers' eight-per cent contributions to GOSI but instead on the average monthly wages he received in the two years preceding his retirement. *See* J.A. 217 (According to Saudi Arabia's Social Insurance Law base amount is "computed by multiplying one-fiftieth of the average monthly wages by the number of insurance years."). Peterson's counsel made two concessions at oral argument that confirm that Peterson had no right, contractual or otherwise, to this benefit stream, which resembles our Social Security system more than a pension—such as a 401(k) plan. Peterson's counsel conceded both that Peterson was not guaranteed a return of the eight-per cent contributions his employers made to GOSI in his behalf, *see* Tr. of Oral Argument at 32:39, and that Saudi Arabia could have unilaterally eliminated the GOSI program for *all* workers, foreign and domestic, *see* Tr. of Oral Argument at 4:37. Taken together, these factors rebut Peterson's assertion that his and his employers' contributions to GOSI constitute "rights in property" of which he was deprived in derogation of international law. *See Brewer v. Socialist People's Republic of Iraq,* 890 F.2d 97, 101 (8th Cir. 1989) (expropriation exception inapplicable because "breach of contract did not create 'rights in property' "); *see also Human Rights in China v. Bank of China*, No. 02 Civ. 4361, 2005 WL 1278542, at *6 (S.D.N.Y. May 27, 2005) (expropriation exception inapplicable because plaintiff had "no legal right to the property" after funds transferred to third party).

Peterson nonetheless makes two arguments to the contrary, neither of which we find persuasive. Citing various authorities—from another circuit's opinion, *Altmann v. Republic of Austria*, 317 F.3d 954 (9th Cir. 2002), to a decision of the European Court of Human Rights, *Skórkiewicz v. Poland (dec.)*, App. 39860/98, Eur. Ct. H.R. (1999), *reprinted in* J.A. at 74, to a law review article, Diego Rodríguez-Pinzón & Claudia Martin, *The International Human Rights Status of Elderly Persons*, 18 AM. U. INT'L L. REV. 915 (2003)—Peterson first contends that we should heed emerging international norms prohibiting a

government's taking of a person's property interest in his contributions to a pension plan. But, as we noted, the GOSI program is not a pension plan but a social insurance system. Thus it is of no moment that Saudi Arabia's Royal Decree No. M/43 affected only one group of GOSI's beneficiaries, *viz.*, non-Saudi employees. Citing United States Supreme Court cases, including *Kaiser Aetna v. United States*, 444 U.S. 164 (1979) and *Perry v. Sindermann*, 408 U.S. 593 (1972), as well as ours, *Nixon v. United States*, 978 F.2d 1269 (D.C. Cir. 1992) and *Hall v. Ford*, 856 F.2d 255 (D.C. Cir. 1988), for the notion that property is "made up of mutually reinforcing understandings," *Nixon*, 978 F.2d at 1275, Peterson additionally argues that his employers' eight-per cent GOSI contributions constitute his property because Saudi Arabia treated it as such by refunding to him his five-per cent GOSI contribution. "[T]here is no common sense, or legal difference between the ownership of the 5% contribution and the 8% contribution made by the employer in the employee's name," his argument goes. Appellant's Br. at 23. While it is debatable that Saudi Arabia's refund of Peterson's five-per cent contribution to GOSI represents a "mutual[] . . . understanding[]" that the contribution was Peterson's property, it is indisputable that the refund does not further represent a "mutual[] . . . understanding[]" that *his employers'* eight-per cent contributions also constituted Peterson's property inasmuch as the refund notified Peterson that the refund constituted "full dues from GOSI." J.A. 22.

Peterson next maintains that FSIA's "commercial activity" exception supplies the necessary jurisdiction. Under this exception,

> [a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an

act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). A foreign state is subject to jurisdiction under this exception based upon any of three distinct types of commercial activity: "commercial activity carried on in the United States," an "act performed in the United States in connection with a commercial activity . . . elsewhere," or an "act outside the territory of the United States in connection with a commercial activity . . . elsewhere" which "causes a direct effect in the United States." *Id.*

Peterson asserts that his claim is based upon the third type—an act that (1) takes place "outside the territory of the United States"; (2) "in connection with a commercial activity of the foreign state elsewhere"; and (3) "causes a direct effect in the United States." *Id.* The act that took place outside the United States, he says, is Saudi Arabia's 1987 Royal Decree excluding non-Saudi employees from GOSI, Royal Decree No. M/43. The Decree was issued "in connection with a commercial activity," he continues, because the "act of investing the employee contributions in private companies and providing loans to private industry constituted commercial activity," Appellant's Br. at 36-37, and because the retirement system was established for an "overriding commercial purpose"—*i.e.*, "to attract highly skilled foreign workers . . . to live and work in Saudi Arabia for the purpose of developing the country's infrastructure," Appellant's Br. at 38. The Royal Decree caused a "direct effect" in the United States, Peterson concludes, because Saudi Arabia is "accustomed to sending refund checks to be deposited in bank accounts in the United States and [its] failure to send a

full refund has thus caused [a] direct effect in the United States." Appellant's Br. at 40.

Whatever the merit of Peterson's arguments regarding the first two requirements, we conclude that his claim fails the final one—*i.e.*, that the "commercial activity" causes a "direct effect" in the United States. In *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992), the Supreme Court defined the term "direct effects"; "an effect is 'direct,' " the *Weltover* Court said, "if it follows 'as an immediate consequence of the defendant's . . . activity.' " *Id.* at 618 (quoting & citing *Weltover, Inc. v. Republic of Argentina,* 941 F.2d 145, 152 (2d Cir. 1991)) (ellipsis by Court). The *Weltover* Court concluded that Argentina's unilateral rescheduling of the maturity dates of certain bonds caused a "direct effect" in the United States because the payees "had designated their accounts in New York as the place of payment, and Argentina made some interest payments into those accounts before announcing that it was rescheduling the payments." 504 U.S. at 618-19. "Because New York was thus the place of performance for Argentina's ultimate contractual obligations," the Court explained, "the rescheduling of those obligations necessarily had a 'direct effect' in the United States: Money that was supposed to have been delivered to a New York bank for deposit was not forthcoming." *Id.* at 619. We applied *Weltover* in *Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143 (D.C. Cir. 1994), and concluded that no "direct effect" in the United States resulted from an Iraqi bank's failure to honor letters of credit because that failure resulted in "no 'immediate consequence' in the United States." *Id.* at 1146 (quoting *Weltover*, 504 U.S. at 618). We found "[t]he situation . . . quite different" from *Weltover* because "[n]either New York nor any other United States location was designated as the 'place of performance' where money was 'supposed' to have been paid" to the plaintiffs. *Id.* (quoting *Weltover*, 504 U.S. at 619). We explained that the bank "might well have paid them from funds in United States

banks but it might just as well have done so from accounts located outside of the United States." 26 F.3d at 1146-47.

Peterson's allegations fail to demonstrate that Saudi Arabia was " 'supposed' to" refund his GOSI contribution to him in the United States. *See id.* at 1146 (quoting *Weltover*, 504 U.S. at 619). In his complaint, he asserted that he "and other foreign workers, their employers, GOSI, and the Saudi Government all understood that Plaintiff would return to the United States and that GOSI benefits would be remitted here," Complaint at 7, ¶ 28, *reprinted in* J.A. at 7, and that he "believed that his contributions to GOSI would be returned to him in the United States." Complaint at 7, ¶ 29, *reprinted in* J.A. at 7. In his brief to us, he further states that he submitted to the district court "numerous declarations . . . from other foreign workers similarly situated demonstrating that [Saudi Arabia was] accustomed to refunding the GOSI contributions in the United States" and that "remittances of GOSI annuity benefits . . . were to be sent to the last known addresses of covered employees." Appellant's Br. at 40 & n.10. These assertions evidence no agreement—implied or express—that Peterson was to be paid in the United States. In fact, he was not paid in the United States. Although he claims to have made "special arrangements," Appellant's Br. at 40, Peterson not only received his refund in Saudi Arabia but deposited it in a Saudi bank as well—the entire transaction occurred outside the United States. Moreover, Peterson's counsel stated below that Saudi Arabia "represented" to non-Saudi employees that it would refund GOSI contributions "wherever the workers lived," J.A. 320, so that, if Peterson chose to reside outside the United States, Saudi Arabia would have returned his contribution to him there, *see* J.A. 320 ("Of course, if [Peterson] moved to another country, he would have asked to be paid elsewhere and he would have been paid elsewhere."). Thus, similar to the situation in *Goodman Holdings*, Saudi Arabia "might well have paid" Peterson or another employee in the United States "but it might just as well

have done so" outside the United States. 26 F.3d at 1146-47; *see also Princz*, 26 F.3d at 1172 ("A 'direct effect' . . . is one which has no intervening element, but, rather, flows in a straight line without deviation or interruption." (internal quotation marks & citation omitted)). Accordingly, the "commercial activity" exception does not provide any court in the United States with the jurisdiction necessary to entertain Peterson's suit against Saudi Arabia.

* * *

For the foregoing reasons, the judgment of the district court is affirmed.

*So ordered.*