# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 8, 2010          Decided April 6, 2010

No. 09-7060

CRUISE CONNECTIONS CHARTER MANAGEMENT 1, LP AND
CRUISE CONNECTIONS CHARTER MANAGEMENT GP, INC.,
APPELLANTS

v.

ATTORNEY GENERAL OF CANADA, REPRESENTING THE ROYAL
CANADIAN MOUNTED POLICE, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-02054-JR)

———

*Jack M. Strauch* argued the cause and filed the briefs for appellants. *Deborah J. Israel* entered an appearance.

*John M. Townsend* argued the cause for appellees. With him on the brief was *Scott H. Christensen*.

Before: TATEL, *Circuit Judge*, and SILBERMAN and WILLIAMS, *Senior Circuit Judges*.

*Opinion for the Court filed by Circuit Judge* TATEL

TATEL, *Circuit Judge*: Under the Foreign Sovereign Immunities Act, foreign governments engaging in commercial activities outside the United States enjoy immunity from suit in U.S. courts unless those activities have a "direct effect" in the United States. In this case the Canadian government terminated a contract with a U.S. company to provide cruise ship services in Canada. Because this left the U.S. company unable to consummate fully negotiated, multi-million-dollar subcontracts with U.S.-based cruise lines to provide the necessary ships, we conclude that Canada's termination of the contract had a "direct effect" in the United States.

**I**

In 2008, Cruise Connections, a U.S. corporation based in Winston-Salem, N.C., signed a contract with the Royal Canadian Mounted Police (RCMP) under which Cruise Connections would provide three cruise ships to dock in Vancouver during the 2010 Olympic Winter Games. RCMP planned to use the ships to house security staff needed for the Games. The contract required Cruise Connections to subcontract with two U.S.-based cruise lines, Holland America and Royal Caribbean, to provide the necessary ships. For this service, RCMP agreed to pay Cruise Connections a little more than $54 million (Canadian) in three direct payments.

With the RCMP contract in hand, Cruise Connections entered "the final stages of negotiating" subcontracts, called Charter Party Agreements, with Holland America and Royal Caribbean to provide the three ships at a cost of approximately $39 million (U.S.). Tracey Kelly Aff. ¶ 7. Because the ships would remain in Vancouver for several

weeks, the two companies demanded assurances that they would incur no liability for Canadian corporate income and payroll taxes. Although RCMP originally gave these assurances, promising to cover all taxes due, it reversed course just as Holland America and Royal Caribbean were set to sign the Charter Party Agreements and disavowed responsibility for any payroll and income taxes. Unprotected from tax liability, the two companies balked, leaving Cruise Connections unable to deliver signed Charter Party Agreements by the required date. RCMP then terminated its contract with Cruise Connections.

Cruise Connections sued RCMP, Her Majesty the Queen in Right of Canada, and the Attorney General of Canada in the United States District Court for the District of Columbia, alleging both breach of contract and unfair trade practices. Although acknowledging that RCMP, as an "agency or instrumentality" of the federal government of Canada, 28 U.S.C. § 1603(b), generally enjoys immunity from suit in U.S. courts under the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602–11, Cruise Connections argued that the FSIA's commercial activities exception applies. As relevant here, that exception abrogates sovereign immunity

> in any case . . . in which the action is based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

*Id.* § 1605(a)(2). RCMP conceded that contracting for chartered ships qualifies as a commercial activity and that its alleged breach satisfies the "act" requirement. It argued, however, that the alleged breach had no "direct effect in the United States" and moved to dismiss for lack of jurisdiction.

*See* 28 U.S.C. § 1330(a) (providing district courts with subject matter jurisdiction over cases against foreign governments only when an FSIA exception applies).

Cruise Connections responded with two arguments. First, it contended that the contract required RCMP to pay it via wire transfer to a U.S. bank and that RCMP's failure to make those payments qualified as a direct effect in the United States. Second, it argued that RCMP's cancellation also caused a direct effect in the United States because it resulted in the loss of U.S. business to Cruise Connections and the cruise lines. This loss included not only the millions of dollars to charter the three ships, but also an additional $4.5 million (U.S.) that Cruise Connections estimated it lost because the Charter Party Agreements contained standard provisions for on-board revenue—passenger purchases for alcoholic beverages, gift items, etc.—under which Cruise Connections would guarantee a set amount of revenue and then receive anything collected in excess of that base amount. In addition, Cruise Connections had arranged with a U.S. travel agency to charter one of the cruise ships as it sailed between San Diego, its home base, and Vancouver. Under that agreement, the travel agency would have paid Cruise Connections a flat rate of $1.25 million (U.S.).

The district court rejected both arguments. With respect to the place of payment, the court read the contract to require "payments to an account of Cruise Connections' choosing" rather than specifically to an account in the United States. *Cruise Connections Charter Mgmt. 1, LP v. Attorney Gen. of Can.*, 634 F. Supp. 2d 86, 89 (D.D.C. 2009). Although Cruise Connections contended that it would have designated a recently opened account at a North Carolina bank as the place of payment had the contract progressed to the point of sending invoices with payment instructions (as the contract required),

the district court concluded that "opening a bank account with the intention of demanding payment there is not an exercise of [Cruise Connections'] right" to direct payment. *Id.* at 89–90. Because Cruise Connections had yet to communicate its intent to request payment in North Carolina, the court concluded that the parties had never agreed that RCMP would pay in the United States, so its nonpayment could not constitute a direct effect. *Id.* As to the loss of business, the district court found that "Cruise Connections' inability to perform its contractual obligations to the third parties" constituted an intervening element between RCMP's breach and the broken third-party agreements. *Id.* at 90. Accordingly, the district court concluded that RCMP enjoyed sovereign immunity and dismissed the complaint for lack of jurisdiction.

Cruise Connections appeals, reiterating the arguments it made in the district court. We review the district court's jurisdictional determinations de novo. *See Peterson v. Royal Kingdom of Saudi Arabia*, 416 F.3d 83, 86 (D.C. Cir. 2005). Because RCMP challenges "only the legal sufficiency of [Cruise Connections'] jurisdictional allegations," we take Cruise Connections' version of the facts as true. *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000).

## II

We begin with Cruise Connections' claim that any one of the losses caused by the termination of its contract with RCMP—the lost cruise ship business, the lost profit from on-board revenues, the lost travel agency fee—qualifies as a direct effect in the United States. In its brief, RCMP responds only to the latter two claims, arguing that each is "too attenuated or remote to amount to a 'direct effect.'" Appellees' Br. 29.

RCMP's point regarding on-board revenue payments may have merit. Because Cruise Connections' opportunity to receive any payments under the on-board revenue provisions of the Charter Party Agreements depended entirely on whether security personnel housed on the ships chose to buy drinks or gifts, Cruise Connections might have received nothing even if RCMP had consummated the contract. Under this view, Cruise Connections' failure to earn any on-board revenue payments might be regarded as subject to an "intervening event" independent of RCMP's cancellation of the contract. *See Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1172 (D.C. Cir. 1994) ("A 'direct effect' . . . 'is one which has no intervening element, but, rather, flows in a straight line without deviation or interruption.'" (quoting *Upton v. Empire of Iran*, 459 F. Supp. 264, 266 (D.D.C. 1978))). In the end, however, we need not decide whether non-payment of on-board revenues qualifies as a direct effect because no intervening event stood between RCMP's termination of the contract and the lost revenues from the travel agency contract and the Charter Party Agreements.

The travel agency agreement was a done deal: Cruise Connections would have received a flat fee no matter how many passengers the travel agency booked. Likewise, "all that remained for the [Charter Party Agreements] to be formally consummated was for the cruise lines to sign the agreements once RCMP confirmed its contractual responsibility for Canadian taxes." Appellants' Br. 40. In both instances, then, RCMP's termination of the Cruise Connections contract led inexorably to the loss of revenues under the third-party agreements. This is sufficient. As the Supreme Court explained in *Republic of Argentina v. Weltover*, an effect qualifies as direct "if it follows as an immediate consequence of the defendant's . . . activity." 504 U.S. 607, 618 (1992) (internal quotation marks omitted). In

*Weltover*, the Court concluded that Argentina's unilateral extension of bonds held by foreign creditors caused a direct effect in the United States because as a consequence of Argentina's breach, "[m]oney that was supposed to have been delivered to a New York bank for deposit was not forthcoming." *Id.* at 619. So too here. Because RCMP terminated the contract, revenues that would otherwise have been generated in the United States were "not forthcoming."

Resisting this conclusion, RCMP argues that it never agreed to any "single aspect of the underlying transaction that . . . [would] take place in the United States." Appellees' Br. 23. The FSIA, however, requires only that effect be "direct," not that the foreign sovereign agree that the effect would occur. *Cf. Weltover*, 504 U.S. at 618, (rejecting the idea that the commercial activity exception "contains any unexpressed requirement of . . . 'foreseeability.'"). In any event, the contract itself required the ships to come from Holland America and Royal Caribbean cruise lines, Michael Day Decl., Ex. 6, and record evidence makes clear that both are U.S.-based companies—Holland America in Seattle and Royal Caribbean in Miami, Tracey Kelly Aff. ¶ 16.

RCMP next argues that harm to a U.S. citizen, in and of itself, cannot satisfy the direct effect requirement. True enough, but the cases RCMP relies on involve situations in which the plaintiff's U.S. citizenship was the *only* connection to the United States. For example, in *United World Trade, Inc. v. Mangyshlakneft Oil Products Ass'n*, 33 F.3d 1232, 1237–39 (10th Cir. 1994), all activities covered by the contract would have occurred outside the United States: oil drilling in Kazakhstan, shipment to and refining in Italy, and payment in France and England. The plaintiff's incorporation in Colorado provided the only link to the United States. *Id.* at 1238. Likewise, in *Zedan v. Kingdom of Saudi Arabia*, 849

F.2d 1511, 1515 (D.C. Cir. 1988), we found no direct effect where the contract between the plaintiff, a U.S. citizen, and Saudi Arabia called for all work to be done in Saudi Arabia and the breach occurred while the plaintiff was in Saudi Arabia. Again, plaintiff's U.S. citizenship furnished the only connection between the commercial activity and the United States. By contrast, Cruise Connections relies on far more than its U.S. citizenship. All its efforts to negotiate the Charter Party Agreements occurred in the United States, Tracey Kelly Aff. ¶ 16; at least one of the ships would have moved through U.S. waters to Vancouver; the termination of the contract thwarted over $40 million (U.S.) worth of cruise-related business in the United States; and the travel agency agreement was negotiated in and called for performance in the United States, *id.* ¶ 18.

At oral argument, RCMP's counsel claimed that the termination of the Charter Party Agreements cannot qualify as a direct effect because it did not harm Cruise Connections. But even setting aside our long-established rule that we rarely consider contentions made for the first time at oral argument, *see Rempfer v. Sharfstein*, 583 F.3d 860, 867 n.6 (D.C. Cir. 2009), RCMP's point misses the mark. Nothing in the FSIA requires that the "direct effect in the United States" harm the plaintiff. *See* 28 U.S.C. § 1605(a)(2). The commercial activities exception requires only that the foreign government's "act outside the territory of the United States . . . cause[] a direct effect in the United States." *Id.* Perhaps Cruise Connections has suffered less harm than it claims, but that issue relates to the merits of its case, not the jurisdictional question we face here.

Given the foregoing, we have no need to consider Cruise Connections' alternative claim, i.e., that the contract required RCMP to pay via wire transfer to a U.S. bank and that

RCMP's failure to do so qualifies as a direct effect in the United States. Although the parties debate several decisions addressing whether a foreign sovereign had to have agreed to the use of a U.S. bank account, in each of those cases that bank account represented the only possible link to the United States. *See Weltover*, 504 U.S. at 619; *Agrocomplect AD v. Republic of Iraq*, 304 F. App'x 872 (D.C. Cir. 2008); *IDAS Res. v. Empresa Nacional de Diamantes de Angola*, 2007 U.S. App. LEXIS 25500, at *4–5 (D.C. Cir. Oct. 29, 2007); *Peterson*, 416 F.3d at 91; *Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143, 1146–47 (D.C. Cir. 1994). Moreover, none of those cases dealt with a situation like the one we face here: where the alleged breach resulted in the direct loss of millions of dollars worth of business in the United States. It thus makes no difference where RCMP would have paid Cruise Connections.

## III

For the foregoing reasons, we reverse and remand to the district court for further proceedings consistent with this opinion.

*So ordered.*