PILLARD, Circuit Judge,
concurring in part and dissenting in part:
I agree with the majority that this case involves commercial activity under the Foreign Sovereign Immunities Act, and that neither the waiver exception to the Act nor either of the first two clauses, of the FSIA’s commercial activity exception applies to permit Peter Odhiambo’s suit. I write separately to explain why I believe that this case should have been allowed to proceed under the third clause of the commercial activity exception.
Odhiambo’s claim is based on “an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere ... that ... eause[d] a direct effect in the United States.” 28 U.S.C. § 1605(a)(2). An effect in the United States in connection with a sovereign’s commercial activity abroad is “direct” under the third clause of the FSIA’s commercial activities exception “if it follows as an immediate consequence of the defendant’s activity.” Republic of Arg. v. Weltover, Inc., 504 U.S. 607, 618, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (internal quotation marks and ellipsis omitted). To be “direct,” the effect need be neither “substantial” nor “foreseeable,” so long as it is more than “purely trivial.” Id.
The facts that Odhiambo alleges, and the reasonable inferences drawn in his favor from those facts, support the conclusion that there is a direct effect in the United States caused by actions of Kenya in connection with a commercial activity. Various of Kenya’s actions in connection with the reward contract that forms the basis of Odhiambo’s claim constitute “direct effects,” including:
• Kenya offered rewards to members of the public for information about tax evasion, without limiting the offer to Kenyan nationals or residents, and without specifying the place of performance of such contract;
• The offer contained the promise that the Kenyan government would keep informants’ identities secret in order to protect them from reprisals, but Kenya failed to keep Odhiambo’s whistle blowing secret, thereby exposing him to threats against his life and those of his family members, in response to which Kenyan government officials actively assisted in resettling Odhiambo as a refugee in the United States;
• Exiled in the United States, Odhimabo necessarily experiences here the direct effect of Kenya’s continued failure to pay.
In sum, Odhiambo is present here, cannot safely return to Kenya, and experiences Kenya’s non-payment here in the United States as the “immediate consequence” of Kenya’s actions.
*44 The FSIA requires that we consider all facts relevant to whether the unlawful conduct of a foreign sovereign acting in its commercial capacity had a “direct effect” in the United States. We are bound to do so by the statute’s terms, the Supreme Court’s decision in Weltover, 504 U.S. 607, 112 S.Ct. 2160, and our own court’s FSIA precedents, see', e.g., de Csepel v. Republic of Hung., 714 F.3d 591 (D.C.Cir.2013); Cruise Connections Charter Mgmt. 1, LP v. Att’y Gen. of Can., 600 F.3d 661 (D.C.Cir.2010).
The majority’s determination that the lack of a place-of-performance clause defeats Odhiambo’s claim misconstrues the FSIA’s direct-effects analysis. The court’s opinion misreads the prior cases to “turn[ ] on whether the contract in question established the United States as a place of performance.” Op. at 38. But our decision in Cruise Connections explicitly held to the contrary, that “[t]he FSIA ... requires only that [the] effect [in the United States] be ‘direct,’ not that the foreign sovereign agree that the effect would occur” in the United States. 600 F.3d at 665 (emphasis added). In conflict with Cruise Connections, the majority insists that, unless the plaintiff can point to a contract term explicitly or implicitly designating the United States as the place of performance, any claim arising from foreign commercial activity affects the U.S. “only indirectly” and thus is barred by the FSIA. Op. at 38. I disagree.
Not every claim that relates to a foreign sovereign’s commercial activity, must be governed by a place-of-performance clause, such as one might expect to find in a commercial contract, before the claim may proceed under our FSIA direct-effect clause precedents. Indeed, claims based on actions “in connection with” commercial activity need not even be contract claims. See, e.g., Princz v. Fed. Republic of Ger., 26 F.3d 1166, 1168 (D.C.Cir.1994) (claiming false imprisonment, assault and battery, negligent and intentional infliction of emotional distress, and quantum meruit). But see 28 U.S.C. § 1605(a)(5)(B) (recognizing immunity for noncommercial torts with respect to “any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights”). Even where the claim does arise out of a contract, specification of the anticipated place of performance is especially unlikely in a case such as this one, involving a unilateral contract drafted by the foreign government whose own inability to protect the plaintiff accounts for his having to flee, cf. de Csepel, 714 F.3d 591, especially when that government’s own officials helped to direct the plaintiff to the United States. It is common ground that, in cases in which parties engage in commercial activities abroad and a plaintiff thereafter unilaterally decides to relocate to the United States where he then seeks to enforce claims relating to the foreign commercial activity, the direct-effects requirement is not satisfied. See, e.g., Peterson v. Royal Kingdom of Saudi Arabia, 416 F.3d 83 (D.C.Cir.2005); Zedan v. Kingdom of Saudi Arabia, 849 F.2d 1511 (D.C.Cir.1988). But the result should be different where, for example, a foreign government hires an American employee or firm abroad without specifying place of performance, and, once the work is complete, reneges on payment and deports the employee to the United States. Where a foreign government causes a plaintiff to leave its country and helps direct him to the United States, as is alleged here, the FSIA should not bar suit against it in United States courts.
To the extent that the majority opinion is simply a fact-specific application of Welt-over and our precedents, I believe it is in error for the reasons I explain. But the majority opinion appears to go further, to *45 create a new legal rule for FSIA direct-effect clause claims, requiring an express or implied place-of-performance clause specifying the United States. Any such rule is in conflict with Weltover and our own decisions, so cannot have binding effect. See United States v. Old Dominion Boat Club, 630 F.3d 1039, 1045 (D.C.Cir. 2011) (“[W]hen a conflict exists within our own precedent, we are bound by the earlier decision.” (citing Indep. Cmty. Bankers of Am. v. Bd. of Governors of the Fed. Reserve Sys., 195 F.3d 28, 34 (D.C.Cir. 1999))).
I.
Odhiambo, a professional auditor at a private commercial bank in Kenya, accepted his government’s unilateral offer of a reward for information revealing tax fraud. The “Information Reward Scheme” promised a 1% bounty for information leading to the identification of “hitherto undisclosed taxes,” and 3% for information leading to their recovery. J.A. 16. The published offer called on the public to share such information, and promised that “volunteers are assured of strict confidentiality to safeguard identities.” Id. The offer included e-mail addresses as well as other contact information, and did not geographically place any limit on the sources from whence whistleblowers might provide the needed information.
Odhiambo responded to the Kenyan government’s offer by providing reliable information about a widespread scheme of criminal tax evasion that was being operated through the private commercial bank at which he worked. The scheme was so extensive that, once the government learned of it and appointed a task force to investigate, the bank was placed under statutory management and ultimately forced to close. (By that time, Odhiambo had left its employ and was working at the Central Bank of Kenya.) The information Odhiambo submitted led to detection of hundreds of millions of dollars in unpaid taxes and the recovery of a large part of that figure. Kenya began to fulfill its end of the bargain by giving Odhiambo initial payment of a token sum to show its appreciation, followed by a percentage payment relating to only a small fraction of the fraud he identified.
Kenya failed to keep Odhiambo’s identity secret, despite its promise. He received anonymous phone calls telling him to leave Kenya. As the bank investigation intensified, police officers with “a bogus warrant” confronted Odhiambo at work and sought to search his home — an effort that Odhi-ambo managed to deflect with the help of the Central Bank’s governor and that the police did not then pursue. J.A. 7. Odhi-ambo received more threatening phone calls and “suspicious people were seen lurking around his house.” Id.
Odhiambo’s performance under the reward contract and leaks regarding his identity as the whistleblower led directly to death threats against him and forced Odhiambo into exile in the United States. Before he left the country, Odhiambo moved his residence twice and changed his phone number. It was the Kenyan government that facilitated Odhiambo’s flight as a refugee, and that helped to select the United States as his destination. Various Kenyan governmental agencies and officials sought to help Odhiambo relocate abroad, including the Kenyan National Commission on Human Rights and the Kenyan Minister for Justice. The Kenyan Human Rights Commissioner facilitated Odhiambo’s meeting with the United States embassy, and helped to arrange for Odhiambo to leave the country as a refugee.
Kenya actively facilitated Odhiambo becoming a refugee in the United States *46 because it recognized that it could not protect his life in Kenya in the face of the threats against him triggered by his performance under its reward contract. Now that it is clear that Odhiambo cannot return to Kenya to sue, Kenya has reneged on millions it owes, instead raising the FSIA as a jurisdictional bar.
II.
The FSIA’s authorization of suit based on a foreign sovereign’s “commercial activities” codifies the “restrictive theory” of sovereign immunity ascendant in international law at the time of the FSIA’s enactment. That theory recognizes that foreign governments are not immune from suit when they act in their commercial, as distinct from sovereign, mode. Permanent Mission of India to the United Nations v. City of New York, 551 U.S. 193, 199, 127 S.Ct. 2352, 168 L.Ed.2d 85 (2007); Welt-over, 504 U.S. at 612-14, 112 S.Ct. 2160. The limitations in the commercial activities exception — including, as relevant here, the direct-effects requirement — fulfill the additional purpose of ensuring sufficient connection to the United States to warrant resort to our courts. See 28 U.S.C. § 1605(a)(2); see also id. § 1330(b) (establishing personal jurisdiction over any claim not subject to immunity under sections 1605-1607 in which the foreign sovereign has been served with process). As the FSIA cases consistently demonstrate, there is no single factual sine qua non of a United States direct effect. Where the facts, taken together, show that a foreign government’s commercial activity has a direct effect in the United States, claims in United States court relating to that commercial activity are not barred by the FSIA.
In Weltover, the Supreme Court held that, under the direct-effect prong of the commercial activities exception, “an effect is ‘direct’ if it follows ‘as an immediate consequence of the defendant’s activity.’ ” 504 U.S. at 618, 112 S.Ct. 2160 (ellipsis omitted). Weltover requires consideration of all facts relevant to that inquiry. In that case, the Court’s conclusion that the rescheduling of Argentina’s currency-stabilizing bond had a direct effect in the United States was supported by various facts: the Swiss and Panamanian creditors’ preference for payment in New York; Argentina’s prior interest payments there; the debt’s designation in U.S. dollars; and, principally, the fact that money the creditors insisted be paid to their New York bank “was not forthcoming.” Id. at 619, 112 S.Ct. 2160. Weltover did not turn on any ex ante contractual specification of the United States as the sole place of performance. The contract contemplated that the money could be paid in any one of several international financial centers, at the election of the creditor, and plaintiffs only later chose New York as the payment locale. Id. at 609-10, 112 S.Ct. 2160. Instead of requiring an ex ante place-of-performance clause, the Court considered a range of facts it deemed relevant to the connection between the commercial activity, the plaintiffs’ claim, and the United States. A handful of relevant facts sufficed to demonstrate that the effect of Argentina’s rescheduling of its bonds was directly felt in the United States, so that foreign sovereign immunity did not bar the suit. Id. at 618-19,112 S.Ct. 2160.
Weltover overruled the precedents of this and other circuits that had limited the effects that could qualify as “direct” under the FSIA’s commercial activities exception to those that were “substantial” and “foreseeable.” Id. at 618, 112 S.Ct. 2160. To the extent the majority adopts a requirement of a place-of-performance clause designating the United States, its analysis conflicts with Weltover by effectively “en- *47 grafting] on § 1605(a)(2)’s commercial activity exception” the requirement of “foreseeability” that Weltover rejected. McKesson Corp. v. Islamic Republic of Iran, 52 F.3d 346, 350 (D.C.Cir.1996). Indeed, to require ex ante contractual designation of the United States as the place of performance imposes a particularly restrictive form of the overruled “foreseeability” condition, demanding not only an objectively “foreseeable” effect, as this court’s overruled precedent had, but a contract term memorializing that the parties actually contemplated an effect in the United States. Cf Maritime Int’l Nominees Establishment v. Republic of Guinea, 693 F.2d 1094, 1111 & n. 28 (D.C.Cir.1982) (noting, under overruled foreseeability requirement, that inquiry did “not require intent in the subjective sense,” but only must have been “reasonably contemplated”).
Following Weltover, our sister circuits have rejected the restrictive contention that a contract must explicitly specify the United States as a place of performance for its breach to cause a direct effect. See DRFP L.L.C. v. Republica Bolivariana de Venez., 622 F.3d 513, 517 (6th Cir.2010) (“We do not read Weltover as creating an additional requirement that the United States be specifically mentioned in the terms of the notes, as suggested by Venezuela.”); Hanil Bank v. PT. Bank Negara Indon. (Persero), 148 F.3d 127, 133 (2d Cir.1998) (“Even assuming that Indonesia is the place of performance under letter of credit law, Weltover does not insist the ‘place of performance’ be in the United States in order for a financial transaction to cause a direct effect in this country. Rather, it only requires an effect in the United States that follows as an immediate consequence of the defendant’s actions overseas.”); see also Callejo v. Bancomer, S.A., 764 F.2d 1101, 1110-12 (5th Cir.1985) (finding a direct effect in case involving a claim for payment on Mexican Certificates of Deposit despite an express clause specifying payment in Mexico, even under pre-Weltover analysis requiring that a direct effect be substantial and foreseeable). Because the majority opinion’s narrowing approach to our FSIA direct-effects precedent, which requires a U.S. place-of-performance clause, conflicts with Weltover and the decisions of this and other circuits, I decline to join it.
It is not the foreseeability or the bargained-for character of an effect that matters. Weltover rejected a requirement of foreseeability and, a fortiori, any requirement of a place-of-performance clause. Instead, the animating rationale of the direct-effect requirement is to assure that a foreign sovereign’s commercial activity abroad has a sufficient connection to the United States to warrant suit here. That is why the decisions of the Supreme Court and our court have stressed the need of an “immediate consequence” in the United States relating to the foreign sovereign’s commercial activity. See, e.g., Weltover, 504 U.S. at 618, 112 S.Ct. 2160. It is also why we have denied jurisdiction in cases in which plaintiffs unilaterally, fortuitously, or after a long period of time and intervening events move to the United States, and, without any other effect here, invoke the jurisdiction of our courts. See, e.g., Princz, 26 F.3d at 1172-73. The connection must not be one created unilaterally by the plaintiff, but must be a direct effect of an act in connection with the- sovereign’s commercial activity. That requirement prevents opportunistic plaintiffs from unilaterally haling foreign sovereigns into United States courts, but it also ensures that private parties are not disadvantaged in commercial dealings with foreign state entities by such entities’ inappropriate assertion of an immunity designed to apply *48 only to actions in the government’s sovereign capacity.[1]
The majority arbitrarily shrinks the class of contract claims that may survive the FSIA sovereign-immunity bar to those in which there is a United States place-of-performance clause — most likely cases in which a foreign sovereign offers or negotiates such a term to induce agreement from parties who want to keep their money in the United States. Needless to say, Kenya’s unilateral offer of reward for information about tax evasion, accepted by a Kenyan national who at the time had no intention of becoming a refugee from his home country, was not such a case.
An ex ante contractual choice of the United States as the place of performance would, of course, typically support a finding of direct effect, but Weltover makes clear that such a clause is not necessary. Indeed, even in those cases in which the United States was contractually specified as the place of performance, this court has not ended its inquiry once it identified such a clause — as it presumably would, were a place-of-performance clause to be the lynchpin the majority makes it. Instead, following Weltover, our decisions have taken account of all facts tending to show whether there is a genuine nexus to the United States or, conversely, a plaintiffs unilateral or gratuitous choice of a U.S. forum.
In Cruise Connections, for example, we found a direct effect in the absence of a U.S. place-of-performance clause. The contract in that case directed “payments to an account of Cruise Connections’ choosing rather than specifically to an account in the United States.” 600 F.3d at 663-64 (internal quotation marks omitted). This court declined to consider whether “the contract required [the defendant] to pay via wire transfer to a U.S. bank” or whether its “failure to do so qualifie[d] as a direct effect.” Id. at 666. We instead found a direct effect because Canada’s breach meant that “revenues that would otherwise have been generated in the United States were ‘not forthcoming.’ ” Id. at 665.
In Goodman Holdings v. Rafidain Bank, 26 F.3d 1143 (D.C.Cir.1994), we also looked to all facts relevant to discerning any potential “direct effect,” not restricting our consideration to whether the United States was the contractually designated place of payment or other contract performance. The overarching question remained whether there was an “ ‘immediate consequence’ in the United States” of the defendant’s breach. Id. at 1146. In that case, past practice was relevant to our conclusion that the defendant “might well have paid [the plaintiffs] from funds in United States banks but it might just as well have done so from accounts located outside of the United States, as it had apparently done before.” Id. at 1146-47. We accordingly found no direct effect.
Odhiambo’s circumstances are in certain ways most analogous to those of de Csepel, 714 F.3d 591. The bailment contract in that case, like the unilateral contract here, arose in circumstances in which it would be unrealistic to expect an explicit place-of-performance clause, let alone one selecting the United States as that place. The contract in de Csepel was not written. The *49 complaint alleged that the Hungarian government and Nazi collaborators confiscated the Herzog family’s art collection, and that Hungary’s “possession or re-possession” of the collection “constituted an express or implied-in-faet bailment contract.” Id. at 598 (internal quotation marks omitted). The contract was formed as a “bailment” following the collection’s emphatically non-negotiated expropriation during World War II.
Hungary kept and used the confiscated artwork for decades until the Herzog family sought its return. The complaint did not clearly allege when the bailment arose, and we noted that plaintiffs “never expressly allege[d] that the return of the artwork was to occur in the United States.” Id. at 601. By the time the parties began their unsuccessful negotiation for the return of the artwork, however, Hungary was well aware that some of the family lived in the United States (with others living in Italy), and we held that Hungary’s commercial activity caused a direct effect in the United States because “Hungary promised to return the artwork to members of the Herzog family it knew to be residing in the United States.” Id. The continued deprivation of that artwork thus impinged on the rights of the Herzogs in the United States, in a manner analogous to the effect on Odhiambo of Kenya’s continued failure to pay him here.
The majority strives to fit de Csepel into its place-of-performance clause rubric by describing the case as one in which, “from the moment of contract formation, the United States was a contractually designated place of performance.” Op. at 40. No contract clause in fact required performance in the United States. See 714 F.3d at 601 (noting that complaint did not specify any agreement that artwork was to be returned to the United States). Rather, the reason this court had little difficulty finding a direct effect was because in that case, actions in relation to the commercial activity created a genuine nexus between the claim and the United States.
The majority points to Peterson as support for its requirement of a place-of-performance clause. In Peterson, however, factors not present here tilted the scale against any finding of a direct effect: most prominently, the underlying transaction occurred entirely in Saudi Arabia, and the defendant played no role in the plaintiffs unilateral decision to relocate to the United States. Peterson had worked in Saudi Arabia for over a decade before he moved to the United States and sued for the refund of retirement contributions to which he was entitled once the Saudi government decided to exclude foreigners from its retirement benefit program. In finding no direct effect, we emphasized that “the entire transaction took place outside the United States.” 416 F.3d at 91. The Saudi government had paid Peterson his refund in Saudi Arabia, and Peterson had previously deposited those funds in a Saudi bank. Id. Peterson simply later chose to move to the United States, and his desire for payment here was entirely of his own making. Odhimabo’s move to the United States was not unilateral like Peterson’s, but was necessitated by Kenya’s failure to keep secret Odhiambo’s whistle blowing.
The place-of-payment contract term in Peterson (in which we found no direct effect) was materially identical to that in Cruise Connections (in which we did). In each case, the contract permitted the plaintiff to elect where payment would be made. See Peterson, 416 F.3d at 91 (“Saudi Arabia ‘represented’ to non-Saudi employees that it would refund [their retirement] contributions ‘wherever the workers lived.’ ”); Cruise Connections, 600 F.3d at *50 663, 666 (recounting district court’s finding that contract provided for “payment to an account of [the plaintiffs’] choosing,” an issue the court of appeals did not reach because it concluded that “it makes no difference where [defendant] would have paid Cruise Connections”). And, in each case, the plaintiff elected payment in the United States. But in both cases, we looked beyond the simple inquiry of whether a contract clause designated the United States as the place of payment. See also Weltover, 504 U.S. at 609-10, 112 S.Ct. 2160 (contract provided for payment “at the election of the creditor” in any of several contractually permitted destinations, and creditor chose New York only after Argentina unilaterally rescheduled the debt). Taken together, the cases show that a place-of-performance clause, which for the majority is conclusive, is correctly considered to be neither the sole nor the determining factor.
Under the holistic analysis the precedents require, the direct-effects test is readily met here, as it was in Weltover, Cruise Connections, and de Csepel. At his own government’s invitation, Odhiambo risked his life to help Kenya recover a large amount of stolen money. Kenya’s invitation placed no restrictions on where a whistleblower such as Odhiambo could come from, nor on where he could demand payment. And, given the serious risks he faced in coming forward as a whistleblower, Kenya promised him confidentiality. Odhiambo is in the United States and experiencing the effect of Kenya’s nonpayment here as the direct consequence of accepting Kenya’s offer of reward for information, and Kenya’s failure to fulfill its part of the bargain by keeping Odhiambo’s identity secret and paying him what it owes. Odhiambo moved to the United States, instead of some other locale, not merely with Kenya’s knowledge, but with its guidance and help. Under these circumstances, Odhiambo’s presence in the United States and the financial loss he suffers here are a direct effect of actions in connection with the commercial activity of the reward contract. Those effects suffice to provide a non-trivial nexus between the parties’ commercial activity and the United States adequate to support jurisdiction here under the FSIA.
Odhiambo is no opportunistic forum shopper. He did not unilaterally opt to come to the United States to experience the effects of Kenya’s non-payment of the money it owes him. As Kenya acknowledges, Odhiambo — unlike the plaintiffs in any of the cases on which the majority relies — is unable to return to sue in the foreign country that now asserts its immunity. The United States may not have been the chosen place of performance at the time Odhiambo accepted Kenya’s offer, but Weltover expressly eschews any foreseeability requirement. The absence of a United States place-of-performance clause in Kenya’s reward scheme cannot negate the fact that Kenya’s nonpayment is felt here, as the direct effect in the United States of Kenya’s commercial activities with Odhiambo. I would thus hold that Kenya is not entitled under the FSIA to sovereign immunity from Odhiambo’s suit.
U.S. courts have enforced rewards-based contracts against foreign sovereigns as far back as 1798. See Ellison v. The Bellona, 8 F.Cas. 559, 559 (D.S.C.1798). That is because, as the Eleventh Circuit aptly explained, “[a]nything that makes it easier for countries to welch on their promises to pay for information decreases the real value of any reward they offer and makes it less likely that an offer will be accepted” and so “jeopardize^] ... [the] *51 vital interests ... of every country that offers rewards for information, including this country.” Guevara v. Republic of Peru, 468 F.3d 1289, 1303-04 (11th Cir. 2006).[2] Failing to recognize jurisdiction here rewards Kenya’s decision to default on its promise to pay Odhiambo for the valuable information he provided at great risk to himself. It thereby' threatens the interests of all countries, including our own, to encourage disclosure of information that may be critical to effective enforcement of the law against threats ranging from tax evasion to terrorism.[3]
I believe finding a direct effect on these facts is warranted and so, respectfully, dissent.

. The "immediate consequence” inquiry does not hinge on the non-existence of any arguably intervening event. It is always possible to identify some "intervening event” if one parses finely enough, be it changed economic or political conditions affecting commercial activities, or the purchase of a plane ticket for travel with a stopover. The focus of the inquiry is, instead, on whether the actions of both parties create a sufficient nexus to the United States for a breach to cause a nontrivial consequence here.

. The court eventually found no direct effect" in the United States of the reward contract in Guevara, but did so, not for lack of contractual designation of the United States as the place of performance, but because Guevara was in the United States as " 'an immediate consequence’ of his criminal activity, not of Peru's offer of a reward for Montesi-nos’s capture.” Guevara v. Republic of Peru, 608 F.3d 1297, 1310 (11th Cir.2010).

. Reward contracts are an important source of valuable information for governments around the world, and there are strong reasons to believe that they should be enforceable, and be understood as such by people who might respond to them. The U.S. Department of State, for example, runs a "Rewards for Justice” program that currently offers a reward of up to $25 million for Ayman al-Zawahiri (the current head of al-Qaeda), among others. See Rewards for Justice, Most Wanted, http://www.rewardsfoijustice.net/ english/most-wanted/all-regions.html (last visited Aug. 12, 2014). The United States additionally offers rewards pursuant to the False Claims Act, and the Internal Revenue Service, Securities and Exchange Commission, and Commodity Futures Trading Commission also administer rewards programs. According to a 2012 news report, the biggest reward paid at that point was $104 million by the IRS for to a bank employee who, like Odhiambo, provided information on tax evasion. See David Kocieniewski, Whistle-Blower Awarded $104 Million by I.R.S., N.Y. Times, Sept. 12, 2012, at Al.