# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued April 8, 2014         Decided August 29, 2014

No. 13-7100

PETER GEORGE ODHIAMBO,
APPELLANT

v.

REPUBLIC OF KENYA, A FOREIGN STATE, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:12-cv-00441)

*Robert W. Ludwig* argued the cause and filed the briefs for appellant. With him on the briefs were *W. Clifton Holmes* and *Thomas K. Kirui*.

*David I. Ackerman* argued the cause for appellees. With him on the brief was *Daniel D. Barnowski*.

Before: GRIFFITH, KAVANAUGH, and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH, with whom *Circuit Judge* GRIFFITH joins.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* PILLARD.

KAVANAUGH, *Circuit Judge*: Kenya wanted to crack down on tax evasion. So it enlisted help from the Kenyan public. The Kenya Revenue Authority issued an ad promising monetary rewards in exchange for information about undisclosed taxes. Enticed by that offer, Kenyan private bank employee Peter Odhiambo blew the whistle on hundreds of accountholders with potential tax deficiencies. Kenya responded by making some rewards payments to Odhiambo. But Odhiambo claimed that he was entitled to more – millions more. When word got out that he was an informant, Odhiambo feared for his safety, and Kenyan officials helped him ultimately move to the United States as a refugee. Odhiambo then sued Kenya in federal district court in Washington, D.C., for breach of contract based on Kenya's alleged underpayment of rewards to Odhiambo.

Under the Foreign Sovereign Immunities Act, foreign governments are immune from suit in U.S. courts unless the plaintiff's claim falls into one of the statute's enumerated exceptions. *See* 28 U.S.C. § 1604. Odhiambo argues that his claims satisfy the FSIA's waiver and commercial activity exceptions. But Kenya has not waived its immunity in U.S. courts "either explicitly or by implication." *Id.* § 1605(a)(1). And Kenya's alleged breach of contract – a contract that was offered, accepted, and performed in Kenya – lacks the connection to the United States required by the commercial activity exception to the FSIA. *See id.* § 1605(a)(2). We therefore conclude, as did the District Court, that the FSIA bars Odhiambo's suit. We affirm.

3

I

For most of our Nation's history, foreign sovereigns enjoyed virtually absolute immunity from suit in U.S. courts. *See Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983); *The Schooner Exchange v. M'Faddon*, 11 U.S. 116, 136-46 (1812) (Marshall, C.J.). That changed in 1952, when the State Department and then the courts adopted the "restrictive theory" of sovereign immunity. Under the restrictive theory, foreign states retain immunity for sovereign public acts but not for private commercial acts. *See Republic of Austria v. Altmann*, 541 U.S. 677, 689-91 (2004); *Verlinden*, 461 U.S. at 486-88. In the Foreign Sovereign Immunities Act of 1976, Congress codified the restrictive theory and further defined the scope of foreign sovereign immunity. *See* Pub. L. No. 94-583, 90 Stat. 2891. Since then, the FSIA has provided "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989); *see Peterson v. Royal Kingdom of Saudi Arabia*, 416 F.3d 83, 86 (D.C. Cir. 2005). As the Supreme Court recently reiterated, the FSIA supplies a "comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state." *Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250, 2255 (2014) (quoting *Verlinden*, 461 U.S. at 488).

Under the FSIA, a district court has subject matter jurisdiction over a suit against a foreign state if – and only if – the plaintiff's claim falls within a statutorily enumerated exception. *See* 28 U.S.C. §§ 1330(a), 1604, 1605. In other words, the FSIA exceptions are exhaustive; if no exception applies, the district court has no jurisdiction. *See Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993); *Peterson*, 416 F.3d at 86.

Two FSIA exceptions are relevant to this case. The first is the waiver exception, which permits a suit when "the foreign state has waived its immunity either explicitly or by implication." *Id.* § 1605(a)(1). The second is the commercial activity exception, which permits a suit when "the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." *Id.* § 1605(a)(2).

The dispute here arises from an "Information Reward Scheme" developed by the Kenya Revenue Authority to enlist public cooperation in enforcing Kenya's tax laws. The scheme "rewards persons who provide information as below:

- Information leading to the *identification* of hitherto undisclosed taxes – a reward amounting to 1% of the tax identified [up to] a maximum of [100,000 Kenyan shillings].
- Information leading to the *recovery* of hitherto undisclosed taxes – a reward amounting to 3% of the taxes collected."

J.A. 16. In essence, the rewards program encouraged whistleblowers to come forward with information about tax evasion by offering them a share of the proceeds – not unlike our country's False Claims Act or the common law *qui tam* action. *See* 31 U.S.C. §§ 3729-3733; *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 768 & n.1, 774-77 (2000).

The rewards program had its intended effect on Peter Odhiambo, an auditor at a private Kenyan bank called Charterhouse Bank. In April 2004, Odhiambo turned over records implicating more than 800 accountholders in possible tax evasion. The Kenya Revenue Authority rewarded Odhiambo with an initial payment of 200,000 Kenyan shillings (about $2,600). A year later, the Authority made an additional payment of roughly 250,000 Kenyan shillings (about $3,300).

At some point, Charterhouse apparently learned that Odhiambo was the informant behind the investigation. Odhiambo then reported receiving disquieting phone calls telling him to leave Kenya. He was also the victim of alleged police harassment, which he reported to the Kenya National Commission on Human Rights. Believing Odhiambo's safety at risk, Kenyan officials supported his application for asylum in the United States. He was granted asylum and arrived here as a refugee in September 2006.

Before and after his relocation, Odhiambo insisted that Kenya owed him more money for the tips that he had provided about tax evasion at Charterhouse. Odhiambo pressed his claims through written correspondence and in face-to-face meetings with Kenyan officials in the United States. Still unsatisfied, Odhiambo sued Kenya for breach of contract in federal district court in Washington, D.C. He sought approximately $24.5 million in damages to compensate him for Kenya's alleged underpayment of rewards. *See Odhiambo v. Republic of Kenya*, 930 F. Supp. 2d 17, 20-24 (D.D.C. 2013) (*Odhiambo I*).

Kenya moved to dismiss Odhiambo's complaint based on its sovereign immunity to suit in U.S. courts. The District Court agreed with Kenya that the FSIA bars the suit. *See id.*

at 23-35. We review the District Court's sovereign immunity determination de novo. *See Cruise Connections Charter Management 1, LP v. Attorney General of Canada*, 600 F.3d 661, 664 (D.C. Cir. 2010).

## II

Odhiambo invokes two FSIA exceptions to establish district court jurisdiction over his suit: the waiver and commercial activity exceptions. We consider each in turn.

## A

Odhiambo first contends that the FSIA does not bar his suit because the waiver exception applies. The waiver exception provides in relevant part that sovereign immunity will not apply when a "foreign state has waived its immunity either explicitly or by implication." 28 U.S.C. § 1605(a)(1).

In the district court, Odhiambo argued that Kenya had implicitly waived its sovereign immunity to suit in the United States by facilitating his asylum here. In essence, Odhiambo's claim was that Kenya should not be allowed to collect both the benefits of his performance on the contract and the benefits of sovereign immunity while simultaneously reneging on its bargain and creating an environment in which he had to flee the country. The District Court rejected that conception of implicit waiver as inconsistent with the case law, which has found implicit waiver only where the foreign state had "at some point indicated its amenability to suit." *Odhiambo v. Republic of Kenya*, 930 F. Supp. 2d 17, 24 (D.D.C. 2013) (*Odhiambo I*) (quoting *Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1174 (D.C. Cir. 1994)). Odhiambo does not renew this argument on appeal, so we do not consider it.

Odhiambo now claims that Kenya waived its sovereign immunity with respect to claims like his when it acceded to the 1951 Convention Relating to the Status of Refugees. We disagree for two alternative and independent reasons. First, in his submissions to the district court, Odhiambo did not mention the Refugee Convention, much less contend that Kenya's accession constituted a waiver of sovereign immunity in U.S. courts. Odhiambo has therefore forfeited this argument. *See World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1161 & n.10 (D.C. Cir. 2002). Second, even if we were to overlook Odhiambo's failure to timely raise this argument, it would have little merit. The ambiguous and generic language of the Refugee Convention falls far short of the exacting showing required for waivers of foreign sovereign immunity. *See id.* at 1162. Indeed, the Supreme Court has explained that it cannot "see how a foreign state can waive its immunity under § 1605(a)(1) by signing an international agreement that contains no mention of a waiver of immunity to suit in United States courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 442 (1989). The waiver exception to the FSIA does not permit Odhiambo's suit.

B

Odhiambo next relies on the commercial activity exception. That exception applies when

> the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial

activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).

1

Clause one of the commercial activity exception permits a suit against a foreign sovereign when the plaintiff's "action is based upon a commercial activity carried on in the United States by the foreign state." *Id.* § 1605(a)(2). The FSIA in turn defines the phrase "commercial activity carried on in the United States by a foreign state" to mean "commercial activity carried on by such state and having substantial contact with the United States." *Id.* § 1603(e). Thus, to invoke the district court's jurisdiction under clause one, the plaintiff's claim must be "based upon some commercial activity by" the foreign state "that had substantial contact with the United States." *Saudi Arabia v. Nelson*, 507 U.S. 349, 356 (1993) (internal quotation marks omitted).

In the district court, Odhiambo alleged several instances of commercial activity by Kenya that had substantial contact with the United States, including the meetings that Kenyan officials held with him in the United States to discuss the disputed rewards. The problem for Odhiambo is that his breach-of-contract claim is not "*based upon*" that activity. 28 U.S.C. § 1605(a)(2) (emphasis added). As the Supreme Court has explained, a claim is "based upon" commercial activity if the activity establishes one of the "elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." *Nelson*, 507 U.S. at 357. In other words, the alleged commercial activity must establish "a fact without which the plaintiff will lose." *Kirkham v. Société Air France*, 429 F.3d 288, 292 (D.C. Cir. 2005); *see Goodman Holdings v.*

*Rafidain Bank*, 26 F.3d 1143, 1146 (D.C. Cir. 1994) (commercial activity unrelated to elements of claim is "legally irrelevant"). Odhiambo does not seriously contend that his meetings with Kenyan officials in the United States establish any fact without which his breach-of-contract claim will fail. He therefore cannot proceed under clause one.

On appeal, Odhiambo asserts a new twist. He contends that (i) Kenya's rewards offer constitutes a commercial activity by a foreign state on which his claim is based, and (ii) the asserted commercial activity had substantial contact with the United States because of his meetings with Kenyan officials in the United States.[1] As an initial matter, Odhiambo failed to raise this argument in the district court and therefore has forfeited it. But even if we consider Odhiambo's new theory, his interpretation of clause one is doubly flawed under our case law. First, our cases have held that mere business meetings in the United States do not suffice to create substantial contact with the United States for these purposes. *See Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511, 1513 (D.C. Cir. 1988); *Maritime International Nominees Establishment v. Republic of Guinea*, 693 F.2d 1094, 1109 (D.C. Cir. 1982). Second, our cases make clear that clause one requires a plaintiff's claim to be "based upon" *the aspect of the foreign state's commercial activity that establishes substantial contact with the United States*. Our decision in *Kirkham* illustrates that rule. There, we considered a claim by an airline passenger who had purchased a ticket in the United States and alleged an injury negligently caused by an Air France employee in France. We did not, as Odhiambo

---

[1] The District Court assumed without deciding that the rewards offer was a commercial activity. *See Odhiambo v. Republic of Kenya*, 930 F. Supp. 2d 17, 26 (D.D.C. 2013) (*Odhiambo I*). Kenya appears to accept that premise on appeal.

proposes here, ask first whether her claim was based on commercial activity by France and then ask independently whether that commercial activity had substantial contact with the United States. Instead, reasoning from the Supreme Court's decision in *Nelson*, we explained that the "sole question before us" was whether the plaintiff's negligence claim was based upon her ticket purchase in the United States – that is, whether her claim was based upon *the aspect of the foreign state's commercial activity that establishes substantial contact with the United States*. *Kirkham*, 429 F.3d at 291; *see Nelson*, 507 U.S. at 356-58. That is precisely the approach to clause one that Justice White articulated in his concurring opinion in *Nelson*. *See Nelson*, 507 U.S. at 364-65, 370 (White, J., concurring).

*Kirkham*'s interpretation of *Nelson* is fatal to Odhiambo's argument. As explained above, the only aspect of Kenya's commercial activity that allegedly established substantial contact with the United States – his meetings with Kenyan officials in the United States – is not necessary to make out any element of his breach-of-contract claim. Recognizing as much, Odhiambo essentially concedes that *Kirkham* forecloses his argument. *See* Odhiambo Reply Br. 13, 16, 21-22. Odhiambo suggests that *Kirkham* was "implicitly overruled" by *Permanent Mission of India to the United Nations v. New York*, 551 U.S. 193 (2007). *Id.* at 21. But that case had nothing to do with the commercial activity exception. This panel must follow *Kirkham*. And in any event, *Kirkham* is correct. Clause one of the commercial activity exception does not permit Odhiambo's suit.

2

Clause two of the commercial activity exception allows a suit against a foreign sovereign when the plaintiff's claim is

11

based "upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere." 28 U.S.C. § 1605(a)(2). Even assuming that Odhiambo alleged an act that fits that definition, Odhiambo's clause two argument falters on the same grounds as his clause one argument: His breach-of-contract claim is not *based upon* any alleged "act performed in the United States in connection with" Kenya's commercial activity. *Cf. Nelson*, 507 U.S. at 357; *Kirkham*, 429 F.3d at 292; *Goodman*, 26 F.3d at 1145-46.

To be sure, *Nelson*, *Kirkham*, and *Goodman* interpreted the phrase "based upon" in clause one, not clause two. But the virtually identical statutory text and structure of clauses one and two lead us to conclude that "based upon" means the same thing in both clauses. *See Powerex Corp. v. Reliant Energy Services, Inc.*, 551 U.S. 224, 232 (2007); *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005). Indeed, although Odhiambo disagrees with our interpretation of "based upon" in clause one, he does not argue that those same words mean something different in clause two. And to the degree that the text leaves any ambiguity, the legislative history is "crystal clear" that clause two's reference to acts "performed in the United States in connection with a commercial activity of the foreign state elsewhere" is "limited to those" acts "which in and of themselves are sufficient to form the basis of a cause of action." *Zedan*, 849 F.2d at 1514 (quoting H.R. REP. NO. 94-1487, at 19 (1976)); *see* S. REP. NO. 94-1310, at 18 (1976) (same).

In sum, a suit against a foreign sovereign may proceed under clause two only if the "act performed in the United States in connection with a commercial activity of the foreign state elsewhere" establishes a fact without which the plaintiff

will lose.  *See Nelson*, 507 U.S. at 357; *Kirkham*, 429 F.3d at 292.  None of the acts cited by Odhiambo satisfies that test.

3

The closest question in this case arises from clause three of the commercial activity exception.  Clause three permits a suit against a foreign sovereign when the plaintiff's claim is based "upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."  28 U.S.C. § 1605(a)(2).  We agree with Odhiambo that his suit satisfies the first part of clause three:  His claim is based upon the "act" of Kenya's alleged breach of contract, which happened outside the United States in connection with the rewards offer – a presumptively commercial activity of the Kenyan government.  The question remaining is whether Kenya's alleged breach of the rewards offer caused a "direct effect in the United States" given that Odhiambo now resides in the United States.

The leading Supreme Court case on the meaning of "direct effect" is *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992).  In *Weltover*, the Supreme Court considered whether Argentina's decision to delay payments on certain bonds caused a direct effect in the United States.  The Court explained that "an effect is 'direct' if it follows as an immediate consequence of the defendant's" activity.  *Weltover*, 504 U.S. at 618 (internal quotation marks omitted).  The Court reasoned that Argentina's delay of the bond payments caused a direct effect in the United States because the bond contract had established the United States as a "place of performance."  *Id.* at 619.  More specifically, the contract provided for payment in U.S. dollars and directed investors to elect one of four payment locations, including New York.

Thus, at the moment the contract was formed, Argentina assumed "contractual obligations" to pay the bondholders *in New York* (or one of the three other designated locations). *Id.* The investors in *Weltover* chose New York as their place of payment, and Argentina made payments to their New York accounts. *See id.* When Argentina breached its contractual obligations by failing to make bond payments that were "supposed to have been delivered to a New York bank," its breach had a direct effect in the United States. *Id.*

Like *Weltover*, this Court's direct effect cases involving alleged breaches of contract have turned on whether the contract in question established the United States as a place of performance. That approach follows from the text and purpose of the FSIA. By definition, breaching a contract that establishes the United States as a place of performance will have a *direct* effect here, whereas breaching a contract that establishes a different or unspecified place of performance can affect the United States only *indirectly*, as the result of some intervening event such as the plaintiff's move to this country. *See Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1172 (D.C. Cir. 1994). Construing clause three to permit suits in that latter category would create an incentive for every breach of contract victim in the world to move to the United States, demand payment here, and then sue alleging a direct effect of nonpayment in the United States. That result would contradict the statutory term "direct" and undermine Congress's objective of avoiding turning U.S. courts into "small international courts of claims." *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 490 (1983) (internal quotation marks omitted).

This Court's decision in *Peterson v. Royal Kingdom of Saudi Arabia*, 416 F.3d 83 (D.C. Cir. 2005), illustrates our place of performance rule and dictates our result here. In that

case, an American who had worked in Saudi Arabia but resided in the United States claimed that he was contractually entitled to a refund of employee contributions that he had paid to the Saudi government. We held that Saudi Arabia's alleged breach of the contract did not create a direct effect in the United States. Even though Peterson was in the United States at the time of the asserted breach, and even though the Court assumed that Saudi government "understood" as much, the contract included "no agreement – implied or express – that Peterson was to be paid in the United States." *Peterson*, 416 F.3d at 90-91. On the contrary, the contract envisioned that the Saudi government would refund the employee's money to him wherever he was when the payment came due. Of critical importance to our case, the Court in *Peterson* held that such a "pay wherever you are" arrangement does not suffice to create a direct effect in the United States. *See id.*

Likewise, in *Goodman*, this Court concluded that there was no direct effect where the foreign sovereign "might well have paid" its contract partner through a bank account in the United States but "might just as well have done so" outside the United States. *Goodman*, 26 F.3d at 1146-47. Similarly, in *Zedan*, the Court held that there was no direct effect when the allegedly breached contract required the foreign sovereign to "forward the money to" the other party "*wherever* he chose to travel." *Zedan*, 849 F.2d at 1514.

In *Cruise Connections Charter Management 1, LP v. Attorney General of Canada*, 600 F.3d 661 (D.C. Cir. 2010), this Court again observed that "harm to a U.S. citizen, in and of itself, cannot satisfy the direct effect requirement." *Cruise Connections*, 600 F.3d at 665 (citing *Zedan*, 849 F.2d at 1515). The Court in that case went on to find a direct effect based on Canada's alleged breach of a contract that required a U.S. company "to subcontract with two U.S.-based cruise

lines" to provide ships during the Vancouver Olympics. *Id.* at 662. Because "the contract itself required the ships to come from" U.S.-based cruise lines, Canada's alleged breach "led inexorably to the loss of revenues" by the U.S. company in the United States, just as Argentina's breach of the bond contract led to a loss of revenues for the investors who had designated New York as a place of payment in *Weltover*. *Id.* at 665.

Applying that same place of performance rule, this Court in *De Csepel v. Republic of Hungary*, 714 F.3d 591 (D.C. Cir. 2013), found that the plaintiffs had adequately alleged a direct effect in the United States by asserting that Hungary had breached a bailment contract obligating it to return artwork to individuals in the United States. The key to the Court's reasoning was that Hungary had, in forming the bailment contract, "promised to perform specific obligations in the United States." *De Csepel*, 714 F.3d at 600-01. Thus, from the moment of contract formation, the United States was a contractually designated place of performance. The Court emphasized twice that Hungary "knew" the owners of the borrowed artwork "to be residing in the United States" *at the time Hungary formed the bailment agreement*. *Id.* at 601; *see id.* (Hungary "*knew at all relevant times* that the Herzog Heirs owned the Herzog Collection and that certain of the Herzog Heirs resided in the United States") (quoting Complaint ¶ 36) (emphasis added); De Csepel Br. 50 ("United States residents owned portions of the Herzog Collection" "*at the time the bailments were created*" and Hungarian officials "knew that to be the case *when they created bailment agreements*") (emphases added). And the Court expressly contrasted Hungary's promise to perform specific obligations in the United States with the facts of a case in which the Sixth Circuit declined to find a direct effect in the United States because the plaintiffs had not alleged that the foreign state

"ever promised to deliver the art collection to the United States." *De Csepel*, 714 F.3d at 601 (quoting *Westfield v. Federal Republic of Germany*, 633 F.3d 409, 415 (6th Cir. 2011)) (alteration omitted).

In short, Hungary's knowledge – from the moment the bailment agreement was formed – that performing its contractual obligations would require it to return the artwork to owners in the United States was crucial to the Court's finding of a "direct effect in the United States" and to its explanation of why the case was not covered by precedents such as *Peterson*. Indeed, the *De Csepel* Court cited *Peterson* immediately before explaining the relevance of Hungary's knowledge at the time it formed that contract that the owners of the artwork were residing in the United States. *See id.* (quoting *Peterson*, 416 F.3d at 90). We see no indication that the *De Csepel* Court intended to (or did) depart from *Peterson* or our other "direct effect" precedents in any way.

To summarize, this Court's cases draw a very clear line: For purposes of clause three of the FSIA commercial activity exception, breaching a contract that establishes or necessarily contemplates the United States as a place of performance causes a direct effect in the United States, while breaching a contract that does not establish or necessarily contemplate the United States as a place of performance does not cause a direct effect in the United States.

In presenting his case for a direct effect, Odhiambo does not argue that his U.S. presence or U.S. citizenship alone suffices to create a direct effect in the United States. As explained above, the relevant precedents would foreclose any such contention. *See, e.g.*, *Cruise Connections*, 600 F.3d at 665 (citing *Zedan*, 849 F.2d at 1515); *Peterson*, 416 F.3d at 90-91. Instead, Odhiambo tries to model his claim on *De*

*Csepel* by suggesting that the contract established or necessarily contemplated the United States as a place of performance. But nothing in Kenya's rewards offer suggested that the United States might be a place of performance. If the contract designated any place of performance, that place would be Kenya, because the contract expressly provided that rewards would be paid in Kenyan shillings. *See* J.A. 16; *cf. Weltover*, 504 U.S. at 609, 619 (noting that Argentine bond contract that created direct effect in the United States provided for payment in U.S. dollars). Otherwise, the contract simply established the kind of "pay wherever you are" arrangement that we have repeatedly held – particularly in cases like *Peterson* – insufficient to cause a direct effect in the United States. Put another way, no one could look at Kenya's rewards offer and reasonably conclude that Kenya "promised to perform specific obligations in the United States" or was "supposed to" pay recipients in the United States. *De Csepel*, 714 F.3d at 600-01; *Weltover*, 504 U.S. at 619; *Peterson*, 416 F.3d at 90; *Goodman*, 26 F.3d at 1146. Kenya's alleged breach of its obligations therefore did not create a *direct* effect in the United States. On the contrary, as the District Court found, the effect in the United States arose only after a variety of intervening events, including the unveiling of Odhiambo's role as a whistleblower, Odhiambo's phone call to a Kenyan newspaper and the subsequently published story, Odhiambo's outreach to Kenya's Human Rights Commission, and Odhiambo's move to the United States as a refugee. *See Odhiambo I*, 930 F. Supp. 2d at 32. In our view, we could not rule for Odhiambo on this point without departing substantially from our precedents. *See Princz*, 26 F.3d at 1172 (a direct effect "has no intervening element, but, rather, flows in a straight line without deviation or interruption") (internal quotation marks omitted).

In reaching that conclusion, we also note an Eleventh Circuit precedent on a factually similar question. *See Guevara v. Republic of Peru*, 608 F.3d 1297 (11th Cir. 2010) (*Guevara II*). In *Guevara II*, Peru issued a public reward offer in return for information that would directly enable the locating and capture of a high-profile fugitive. During a trip to Miami, one of the fugitive's associates, Guevara, gave up the fugitive's location to the FBI and demanded the reward. When the Peruvian government refused to pay, Guevara sued for breach of contract in South Florida's federal court. The Eleventh Circuit concluded that Peru's alleged breach of the reward offer did not cause a direct effect in the United States. *See id.* at 1300-02, 1309-10. In short, Guevara's mere presence in the United States and demand for payment here did not suffice to create an effect arising directly from the breach of a contract offered in Peru that never established or contemplated the United States as a place of performance. So too here.[2]

Odhiambo alternatively contends that Kenya modified the contractual place of performance by helping him resettle in the United States and knowingly making payments that reached him here. That contention falters on multiple fronts.

---

[2] Odhiambo relies on the Ninth Circuit's decision finding a direct effect in *Adler v. Federal Republic of Nigeria*, 107 F.3d 720 (9th Cir. 1997). But in *Adler*, the contract expressly required the investors to designate an out-of-country location of payment. *See Adler*, 107 F.3d at 727. Here, by contrast, nothing in Kenya's rewards offer allowed – much less required – claimants to demand payment in particular locations. So even if we agreed with the Ninth Circuit's looser approach to the direct effect prong of the analysis, we would still conclude that Odhiambo's suit does not fall within clause three under *Adler*.

First, Odhiambo failed to allege any payments in the United States in his first amended complaint – or at any time prior to the District Court's judgment – even though he apparently received those payments years before he filed his complaint. The District Court therefore did not need to consider those allegations. *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008).

Second, even if we were to consider Odhiambo's allegations, they do not demonstrate that Kenya manifested the consent necessary to modify the contract. Odhiambo offers no reason to believe that Kenya's assistance in his *asylum application* had any impact on the place of performance designated in the *rewards offer*. Although Kenya knows that Odhiambo is in the United States, that alone does not suffice. Kenya has not, in the words of *De Csepel*, "promised to perform specific obligations in the United States." *De Csepel*, 714 F.3d at 600-01. Indeed, far from agreeing with Odhiambo that the contract designates the United States as a place of performance, Kenya has continually refused to issue any payments outside Kenya. Odhiambo has therefore received the payments in the United States only through an intermediary in Kenya who obtained the payments in Kenya and then sent them to Odhiambo. Again, that is a far cry from *De Csepel*, in which the contract never envisioned performance anywhere *other than* the United States. *See id.*

Third, Odhiambo's allegation that he received a payment from the Kenyan government through the Kenyan intermediary while he was in Tanzania further undercuts his claim that the United States was a contractually designated place of performance. In short, the evidence shows this: When Odhiambo was in Kenya, Kenya made payment in Kenya. When Odhiambo was in Tanzania, Kenya made

payment to an intermediary in Kenya, and that intermediary later transferred the money to Odhiambo in Tanzania. When Odhiambo was in the United States, Kenya made payment to an intermediary in Kenya, and that intermediary later transferred the money to Odhiambo in the United States. If Odhiambo were to move somewhere else, we see no reason to doubt that Kenya would make any further payments in Kenya, and that the money would be transferred by an intermediary to Odhiambo in his new locale. That record further buttresses the conclusion that the contract operated precisely as the kind of "pay wherever you are" arrangement that we rejected as a basis for jurisdiction over foreign states in *Peterson* and *Goodman*.

Odhiambo nonetheless suggests that our direct effect analysis should apply differently here because Kenya arranged for him to seek asylum in the United States. *See* Odhiambo Br. 50; Odhiambo Reply Br. 25-26. Under his theory, refugees would be allowed to bring suits in U.S. courts against their former sovereigns if those sovereigns played a role in the refugees' relocation to the United States. Whatever the wisdom of that proposed refugee exception as a policy matter, the FSIA does not recognize it. So neither can we. We must adhere to the text of the statute, especially in FSIA cases. *See Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250, 2255-56 (2014). As we explained above, the FSIA is the sole way for a plaintiff suing a foreign sovereign to invoke the jurisdiction of U.S. courts, and the exceptions enumerated by the FSIA are exhaustive. *See Nelson*, 507 U.S. at 355; *Peterson*, 416 F.3d at 86; *cf. Law v. Siegel*, 134 S. Ct. 1188, 1196 (2014) (enumeration of exemptions "confirms that courts are not authorized to create additional exceptions"). In other words, any claim to a FSIA exception "must stand on the Act's text. Or it must fall." *NML Capital*, 134 S. Ct. at

2256.  Odhiambo's proposed refugee exception cannot stand on the FSIA's text.  So it must fall.

To be sure, Congress and the President of course may enact new legislation to amend the FSIA and include an exception of the kind that Odhiambo proposes.  But until then, the role of this Court "is to apply the statute as it is written – even if we think some other approach might accord with good policy." *Burrage v. United States*, 134 S. Ct. 881, 892 (2014) (internal quotation marks and alterations omitted); *see NML Capital*, 134 S. Ct. at 2258 ("[t]he question . . . is not what Congress 'would have wanted' but what Congress enacted in the FSIA") (quoting *Weltover*, 504 U.S. at 618).

* * *

None of the FSIA exceptions asserted by Odhiambo applies to this case.  His suit therefore cannot proceed.  We affirm the judgment of the District Court.[3]

*So ordered.*

---

[3] The District Court did not abuse its discretion in denying Odhiambo's motion for reconsideration and leave to file a second amended complaint.  Odhiambo's only plausible argument was that he had new evidence, but the District Court reasonably concluded that the evidence was not new.  *See Odhiambo v. Republic of Kenya*, 947 F. Supp. 2d 30 (D.D.C. 2013) (*Odhiambo II*); *see also Ciralsky v. CIA*, 355 F.3d 661, 668, 671-73 (D.C. Cir. 2004).

PILLARD, *Circuit Judge*, concurring in part and dissenting in part: I agree with the majority that this case involves commercial activity under the Foreign Sovereign Immunities Act, and that neither the waiver exception to the Act nor either of the first two clauses of the FSIA's commercial activity exception applies to permit Peter Odhiambo's suit. I write separately to explain why I believe that this case should have been allowed to proceed under the third clause of the commercial activity exception.

Odhiambo's claim is based on "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere . . . that . . . cause[d] a direct effect in the United States." 28 U.S.C. § 1605(a)(2). An effect in the United States in connection with a sovereign's commercial activity abroad is "direct" under the third clause of the FSIA's commercial activities exception "if it follows as an immediate consequence of the defendant's activity." *Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607, 618 (1992) (internal quotation marks and ellipsis omitted). To be "direct," the effect need be neither "substantial" nor "foreseeable," so long as it is more than "purely trivial." *Id.*

The facts that Odhiambo alleges, and the reasonable inferences drawn in his favor from those facts, support the conclusion that there is a direct effect in the United States caused by actions of Kenya in connection with a commercial activity. Various of Kenya's actions in connection with the reward contract that forms the basis of Odhiambo's claim constitute "direct effects," including:

- Kenya offered rewards to members of the public for information about tax evasion, without limiting the offer to Kenyan nationals or residents, and without specifying the place of performance of such contract;

- The offer contained the promise that the Kenyan government would keep informants' identities secret in order to protect them from reprisals, but Kenya failed to keep Odhiambo's whistle blowing secret, thereby exposing him to threats against his life and those of his family members, in response to which Kenyan government officials actively assisted in resettling Odhiambo as a refugee in the United States;

- Exiled in the United States, Odhimabo necessarily experiences here the direct effect of Kenya's continued failure to pay.

In sum, Odhiambo is present here, cannot safely return to Kenya, and experiences Kenya's non-payment here in the United States as the "immediate consequence" of Kenya's actions.

The FSIA requires that we consider all facts relevant to whether the unlawful conduct of a foreign sovereign acting in its commercial capacity had a "direct effect" in the United States. We are bound to do so by the statute's terms, the Supreme Court's decision in *Weltover*, 504 U.S. 607, and our own court's FSIA precedents, *see, e.g.*, *De Csepel v. Republic of Hung.*, 714 F.3d 591 (D.C. Cir. 2013); *Cruise Connections Charter Mgmt. 1, LP v. Att'y Gen. of Can.*, 600 F.3d 661 (D.C. Cir. 2010).

The majority's determination that the lack of a place-of-performance clause defeats Odhiambo's claim misconstrues the FSIA's direct-effects analysis. The court's opinion misreads the prior cases to "turn[] on whether the contract in question established the United States as a place of performance." Slip Op. at 13. But our decision in *Cruise Connections* explicitly held to the contrary, that "[t]he

FSIA . . . requires only that [the] effect [in the United States] be 'direct,' *not that the foreign sovereign agree that the effect would occur*" *in the United States*. 600 F.3d at 665 (emphasis added). In conflict with *Cruise Connections*, the majority insists that, unless the plaintiff can point to a contract term explicitly or implicitly designating the United States as the place of performance, any claim arising from foreign commercial activity affects the U.S. "only indirectly" and thus is barred by the FSIA. Slip Op. at 13. I disagree.

Not every claim that relates to a foreign sovereign's commercial activity must be governed by a place-of-performance clause, such as one might expect to find in a commercial contract, before the claim may proceed under our FSIA direct-effect clause precedents. Indeed, claims based on actions "in connection with" commercial activity need not even be contract claims. *See, e.g.*, *Princz v. Fed. Republic of Ger.*, 26 F.3d 1166, 1168 (D.C. Cir. 1994) (claiming false imprisonment, assault and battery, negligent and intentional infliction of emotional distress, and quantum meruit). *But see* 28 U.S.C. § 1605(a)(5)(B) (recognizing immunity for noncommercial torts with respect to "any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights"). Even where the claim does arise out of a contract, specification of the anticipated place of performance is especially unlikely in a case such as this one, involving a unilateral contract drafted by the foreign government whose own inability to protect the plaintiff accounts for his having to flee, *cf. De Csepel*, 714 F.3d 591, especially when that government's own officials helped to direct the plaintiff to the United States. It is common ground that, in cases in which parties engage in commercial activities abroad and a plaintiff thereafter unilaterally decides to relocate to the United States where he then seeks to enforce claims relating to the foreign

commercial activity, the direct-effects requirement is not satisfied. *See, e.g.*, *Peterson v. Royal Kingdom of Saudi Arabia*, 416 F.3d 83 (D.C. Cir. 2005); *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511 (D.C. Cir. 1988). But the result should be different where, for example, a foreign government hires an American employee or firm abroad without specifying place of performance, and, once the work is complete, reneges on payment and deports the employee to the United States. Where a foreign government causes a plaintiff to leave its country and helps direct him to the United States, as is alleged here, the FSIA should not bar suit against it in United States courts.

To the extent that the majority opinion is simply a fact-specific application of *Weltover* and our precedents, I believe it is in error for the reasons I explain. But the majority opinion appears to go further, to create a new legal rule for FSIA direct-effect clause claims, requiring an express or implied place-of-performance clause specifying the United States. Any such rule is in conflict with *Weltover* and our own decisions, so cannot have binding effect. *See United States v. Old Dominion Boat Club*, 630 F.3d 1039, 1045 (D.C. Cir. 2011) ("[W]hen a conflict exists within our own precedent, we are bound by the earlier decision." (citing *Indep. Cmty. Bankers of Am. v. Bd. of Governors of the Fed. Reserve Sys.*, 195 F.3d 28, 34 (D.C. Cir. 1999))).

# I.

Odhiambo, a professional auditor at a private commercial bank in Kenya, accepted his government's unilateral offer of a reward for information revealing tax fraud. The "Information Reward Scheme" promised a 1% bounty for information leading to the identification of "hitherto undisclosed taxes," and 3% for information leading to their recovery. J.A. 16.

The published offer called on the public to share such information, and promised that "volunteers are assured of strict confidentiality to safeguard identities." *Id.* The offer included e-mail addresses as well as other contact information, and did not geographically place any limit on the sources from whence whistleblowers might provide the needed information.

Odhiambo responded to the Kenyan government's offer by providing reliable information about a widespread scheme of criminal tax evasion that was being operated through the private commercial bank at which he worked. The scheme was so extensive that, once the government learned of it and appointed a task force to investigate, the bank was placed under statutory management and ultimately forced to close. (By that time, Odhiambo had left its employ and was working at the Central Bank of Kenya.) The information Odhiambo submitted led to detection of hundreds of millions of dollars in unpaid taxes and the recovery of a large part of that figure. Kenya began to fulfill its end of the bargain by giving Odhiambo initial payment of a token sum to show its appreciation, followed by a percentage payment relating to only a small fraction of the fraud he identified.

Kenya failed to keep Odhiambo's identity secret, despite its promise. He received anonymous phone calls telling him to leave Kenya. As the bank investigation intensified, police officers with "a bogus warrant" confronted Odhiambo at work and sought to search his home—an effort that Odhiambo managed to deflect with the help of the Central Bank's governor and that the police did not then pursue. J.A. 7. Odhiambo received more threatening phone calls and "suspicious people were seen lurking around his house." *Id.*

Odhiambo's performance under the reward contract and leaks regarding his identity as the whistleblower led directly to death threats against him and forced Odhiambo into exile in the United States. Before he left the country, Odhiambo moved his residence twice and changed his phone number. It was the Kenyan government that facilitated Odhiambo's flight as a refugee, and that helped to select the United States as his destination. Various Kenyan governmental agencies and officials sought to help Odhiambo relocate abroad, including the Kenyan National Commission on Human Rights and the Kenyan Minister for Justice. The Kenyan Human Rights Commissioner facilitated Odhiambo's meeting with the United States embassy, and helped to arrange for Odhiambo to leave the country as a refugee.

Kenya actively facilitated Odhiambo becoming a refugee in the United States because it recognized that it could not protect his life in Kenya in the face of the threats against him triggered by his performance under its reward contract. Now that it is clear that Odhiambo cannot return to Kenya to sue, Kenya has reneged on millions it owes, instead raising the FSIA as a jurisdictional bar.

## II.

The FSIA's authorization of suit based on a foreign sovereign's "commercial activities" codifies the "restrictive theory" of sovereign immunity ascendant in international law at the time of the FSIA's enactment. That theory recognizes that foreign governments are not immune from suit when they act in their commercial, as distinct from sovereign, mode. *Permanent Mission of India to the United Nations v. City of New York*, 551 U.S. 193, 199 (2007); *Weltover*, 504 U.S. at 612-14. The limitations in the commercial activities exception—including, as relevant here, the direct-effects

requirement—fulfill the additional purpose of ensuring sufficient connection to the United States to warrant resort to our courts. *See* 28 U.S.C. § 1605(a)(2); *see also id.* § 1330(b) (establishing personal jurisdiction over any claim not subject to immunity under sections 1605-1607 in which the foreign sovereign has been served with process). As the FSIA cases consistently demonstrate, there is no single factual *sine qua non* of a United States direct effect. Where the facts, taken together, show that a foreign government's commercial activity has a direct effect in the United States, claims in United States court relating to that commercial activity are not barred by the FSIA.

In *Weltover*, the Supreme Court held that, under the direct-effect prong of the commercial activities exception, "an effect is 'direct' if it follows 'as an immediate consequence of the defendant's activity.'" 504 U.S. at 618 (ellipsis omitted). *Weltover* requires consideration of all facts relevant to that inquiry. In that case, the Court's conclusion that the rescheduling of Argentina's currency-stabilizing bond had a direct effect in the United States was supported by various facts: the Swiss and Panamanian creditors' preference for payment in New York; Argentina's prior interest payments there; the debt's designation in U.S. dollars; and, principally, the fact that money the creditors insisted be paid to their New York bank "was not forthcoming." *Id.* at 619. *Weltover* did not turn on any *ex ante* contractual specification of the United States as the sole place of performance. The contract contemplated that the money could be paid in any one of several international financial centers, at the election of the creditor, and plaintiffs only later chose New York as the payment locale. *Id.* at 609-10. Instead of requiring an *ex ante* place-of-performance clause, the Court considered a range of facts it deemed relevant to the connection between the commercial activity, the plaintiffs' claim, and the United

States. A handful of relevant facts sufficed to demonstrate that the effect of Argentina's rescheduling of its bonds was directly felt in the United States, so that foreign sovereign immunity did not bar the suit. *Id.* at 618-19.

*Weltover* overruled the precedents of this and other circuits that had limited the effects that could qualify as "direct" under the FSIA's commercial activities exception to those that were "substantial" and "foreseeable." *Id.* at 618. To the extent the majority adopts a requirement of a place-of-performance clause designating the United States, its analysis conflicts with *Weltover* by effectively "engraft[ing] on § 1605(a)(2)'s commercial activity exception" the requirement of "foreseeability" that *Weltover* rejected. *McKesson Corp. v. Islamic Republic of Iran*, 52 F.3d 346, 350 (D.C. Cir. 1995). Indeed, to require *ex ante* contractual designation of the United States as the place of performance imposes a particularly restrictive form of the overruled "foreseeability" condition, demanding not only an objectively "foreseeable" effect, as this court's overruled precedent had, but a contract term memorializing that the parties actually contemplated an effect in the United States. *Cf. Maritime Int'l Nominees Establishment v. Republic of Guinea*, 693 F.2d 1094, 1111 & n.28 (D.C. Cir. 1982) (noting, under overruled foreseeability requirement, that inquiry did "not require intent in the subjective sense," but only must have been "reasonably contemplated").

Following *Weltover*, our sister circuits have rejected the restrictive contention that a contract must explicitly specify the United States as a place of performance for its breach to cause a direct effect. *See DRFP L.L.C. v. Republica Bolivariana de Venez.*, 622 F.3d 513, 517 (6th Cir. 2010) ("We do not read *Weltover* as creating an additional requirement that the United States be specifically mentioned

in the terms of the notes, as suggested by Venezuela."); *Hanil Bank v. PT. Bank Negara Indon. (Persero)*, 148 F.3d 127, 133 (2d Cir. 1998) ("Even assuming that Indonesia *is* the place of performance under letter of credit law, *Weltover* does not insist the 'place of performance' be in the United States in order for a financial transaction to cause a direct effect in this country. Rather, it only requires an effect in the United States that follows as an immediate consequence of the defendant's actions overseas."); *see also Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1110-12 (5th Cir. 1985) (finding a direct effect in case involving a claim for payment on Mexican Certificates of Deposit despite an express clause specifying payment in Mexico, even under pre-*Weltover* analysis requiring that a direct effect be substantial and foreseeable). Because the majority opinion's narrowing approach to our FSIA direct-effects precedent, which requires a U.S. place-of-performance clause, conflicts with *Weltover* and the decisions of this and other circuits, I decline to join it.

It is not the foreseeability or the bargained-for character of an effect that matters. *Weltover* rejected a requirement of foreseeability and, *a fortiori*, any requirement of a place-of-performance clause. Instead, the animating rationale of the direct-effect requirement is to assure that a foreign sovereign's commercial activity abroad has a sufficient connection to the United States to warrant suit here. That is why the decisions of the Supreme Court and our court have stressed the need of an "immediate consequence" in the United States relating to the foreign sovereign's commercial activity. *See, e.g.*, *Weltover*, 504 U.S. at 618. It is also why we have denied jurisdiction in cases in which plaintiffs unilaterally, fortuitously, or after a long period of time and intervening events move to the United States, and, without any other effect here, invoke the jurisdiction of our courts. *See, e.g.*, *Princz*, 26 F.3d at 1172-73. The connection must not

be one created unilaterally by the plaintiff, but must be a direct *effect of* an act in connection with the sovereign's commercial activity. That requirement prevents opportunistic plaintiffs from unilaterally haling foreign sovereigns into United States courts, but it also ensures that private parties are not disadvantaged in commercial dealings with foreign state entities by such entities' inappropriate assertion of an immunity designed to apply only to actions in the government's sovereign capacity.[1]

The majority arbitrarily shrinks the class of contract claims that may survive the FSIA sovereign-immunity bar to those in which there is a United States place-of-performance clause—most likely cases in which a foreign sovereign offers or negotiates such a term to induce agreement from parties who want to keep their money in the United States. Needless to say, Kenya's unilateral offer of reward for information about tax evasion, accepted by a Kenyan national who at the time had no intention of becoming a refugee from his home country, was not such a case.

An *ex ante* contractual choice of the United States as the place of performance would, of course, typically support a finding of direct effect, but *Weltover* makes clear that such a clause is not necessary. Indeed, even in those cases in which the United States was contractually specified as the place of performance, this court has not ended its inquiry once it

---

[1] The "immediate consequence" inquiry does not hinge on the non-existence of any arguably intervening event. It is always possible to identify some "intervening event" if one parses finely enough, be it changed economic or political conditions affecting commercial activities, or the purchase of a plane ticket for travel with a stopover. The focus of the inquiry is, instead, on whether the actions of both parties create a sufficient nexus to the United States for a breach to cause a non-trivial consequence here.

identified such a clause—as it presumably would, were a place-of-performance clause to be the lynchpin the majority makes it.  Instead, following *Weltover*, our decisions have taken account of all facts tending to show whether there is a genuine nexus to the United States or, conversely, a plaintiff's unilateral or gratuitous choice of a U.S. forum.

In *Cruise Connections*, for example, we found a direct effect in the absence of a U.S. place-of-performance clause. The contract in that case directed "payments to an account of Cruise Connections' choosing rather than specifically to an account in the United States."  600 F.3d at 663-64 (internal quotation marks omitted).  This court declined to consider whether "the contract required [the defendant] to pay via wire transfer to a U.S. bank" or whether its "failure to do so qualifie[d] as a direct effect."  *Id.* at 666.  We instead found a direct effect because Canada's breach meant that "revenues that would otherwise have been generated in the United States were 'not forthcoming.'"  *Id.* at 665.

In *Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143 (D.C. Cir. 1994), we also looked to all facts relevant to discerning any potential "direct effect," not restricting our consideration to whether the United States was the contractually designated place of payment or other contract performance.  The overarching question remained whether there was an "'immediate consequence' in the United States" of the defendant's breach.  *Id.* at 1146.  In that case, past practice was relevant to our conclusion that the defendant "might well have paid [the plaintiffs] from funds in United States banks but it might just as well have done so from accounts located outside of the United States, as it had apparently done before."  *Id.* at 1146-47.  We accordingly found no direct effect.

Odhiambo's circumstances are in certain ways most analogous to those of *De Csepel*, 714 F.3d 591. The bailment contract in that case, like the unilateral contract here, arose in circumstances in which it would be unrealistic to expect an explicit place-of-performance clause, let alone one selecting the United States as that place. The contract in *De Csepel* was not written. The complaint alleged that the Hungarian government and Nazi collaborators confiscated the Herzog family's art collection, and that Hungary's "possession or re-possession" of the collection "constituted an express or implied-in-fact bailment contract." *Id.* at 598 (internal quotation marks omitted). The contract was formed as a "bailment" following the collection's emphatically non-negotiated expropriation during World War II.

Hungary kept and used the confiscated artwork for decades until the Herzog family sought its return. The complaint did not clearly allege when the bailment arose, and we noted that plaintiffs "never expressly allege[d] that the return of the artwork was to occur in the United States." *Id.* at 601. By the time the parties began their unsuccessful negotiation for the return of the artwork, however, Hungary was well aware that some of the family lived in the United States (with others living in Italy), and we held that Hungary's commercial activity caused a direct effect in the United States because "Hungary promised to return the artwork to members of the Herzog family it knew to be residing in the United States." *Id*. The continued deprivation of that artwork thus impinged on the rights of the Herzogs in the United States, in a manner analogous to the effect on Odhiambo of Kenya's continued failure to pay him here.

The majority strives to fit *De Csepel* into its place-of-performance clause rubric by describing the case as one in which, "from the moment of contract formation, the United

States was a contractually designated place of performance." Slip Op. at 15. No contract clause in fact required performance in the United States. *See* 714 F.3d at 601 (noting that complaint did not specify any agreement that artwork was to be returned to the United States). Rather, the reason this court had little difficulty finding a direct effect was because in that case, actions in relation to the commercial activity created a genuine nexus between the claim and the United States.

The majority points to *Peterson* as support for its requirement of a place-of-performance clause. In *Peterson*, however, factors not present here tilted the scale against any finding of a direct effect: most prominently, the underlying transaction occurred entirely in Saudi Arabia, and the defendant played no role in the plaintiff's unilateral decision to relocate to the United States. Peterson had worked in Saudi Arabia for over a decade before he moved to the United States and sued for the refund of retirement contributions to which he was entitled once the Saudi government decided to exclude foreigners from its retirement benefit program. In finding no direct effect, we emphasized that "the entire transaction took place outside the United States." 416 F.3d at 91. The Saudi government had paid Peterson his refund in Saudi Arabia, and Peterson had previously deposited those funds in a Saudi bank. *Id.* Peterson simply later chose to move to the United States, and his desire for payment here was entirely of his own making. Odhimabo's move to the United States was not unilateral like Peterson's, but was necessitated by Kenya's failure to keep secret Odhiambo's whistle blowing.

The place-of-payment contract term in *Peterson* (in which we found no direct effect) was materially identical to that in *Cruise Connections* (in which we did). In each case, the contract permitted the plaintiff to elect where payment would be made. *See Peterson*, 416 F.3d at 91 ("Saudi Arabia

'represented' to non-Saudi employees that it would refund [their retirement] contributions 'wherever the workers lived.'"); *Cruise Connections*, 600 F.3d at 663, 666 (recounting district court's finding that contract provided for "payment to an account of [the plaintiffs'] choosing," an issue the court of appeals did not reach because it concluded that "it makes no difference where [defendant] would have paid Cruise Connections"). And, in each case, the plaintiff elected payment in the United States.  But in both cases, we looked beyond the simple inquiry of whether a contract clause designated the United States as the place of payment. *See also Weltover*, 504 U.S. at 609-10 (contract provided for payment "at the election of the creditor" in any of several contractually permitted destinations, and creditor chose New York only after Argentina unilaterally rescheduled the debt). Taken together, the cases show that a place-of-performance clause, which for the majority is conclusive, is correctly considered to be neither the sole nor the determining factor.

Under the holistic analysis the precedents require, the direct-effects test is readily met here, as it was in *Weltover*, *Cruise Connections*, and *De Csepel*.  At his own government's invitation, Odhiambo risked his life to help Kenya recover a large amount of stolen money.  Kenya's invitation placed no restrictions on where a whistleblower such as Odhiambo could come from, nor on where he could demand payment.  And, given the serious risks he faced in coming forward as a whistleblower, Kenya promised him confidentiality.  Odhiambo is in the United States and experiencing the effect of Kenya's nonpayment here as the direct consequence of accepting Kenya's offer of reward for information, and Kenya's failure to fulfill its part of the bargain by keeping Odhiambo's identity secret and paying him what it owes.  Odhiambo moved to the United States, instead of some other locale, not merely with Kenya's

knowledge, but with its guidance and help. Under these circumstances, Odhiambo's presence in the United States and the financial loss he suffers here are a direct effect of actions in connection with the commercial activity of the reward contract. Those effects suffice to provide a non-trivial nexus between the parties' commercial activity and the United States adequate to support jurisdiction here under the FSIA.

Odhiambo is no opportunistic forum shopper. He did not unilaterally opt to come to the United States to experience the effects of Kenya's non-payment of the money it owes him. As Kenya acknowledges, Odhiambo—unlike the plaintiffs in any of the cases on which the majority relies—is unable to return to sue in the foreign country that now asserts its immunity. The United States may not have been the chosen place of performance at the time Odhiambo accepted Kenya's offer, but *Weltover* expressly eschews any foreseeability requirement. The absence of a United States place-of-performance clause in Kenya's reward scheme cannot negate the fact that Kenya's nonpayment is felt here, as the direct effect in the United States of Kenya's commercial activities with Odhiambo. I would thus hold that Kenya is not entitled under the FSIA to sovereign immunity from Odhiambo's suit.

U.S. courts have enforced rewards-based contracts against foreign sovereigns as far back as 1798. *See Ellison v. The Bellona*, 8 F. Cas. 559, 559 (D.S.C. 1798). That is because, as the Eleventh Circuit aptly explained, "[a]nything that makes it easier for countries to welch on their promises to pay for information decreases the real value of any reward they offer and makes it less likely that an offer will be accepted" and so "jeopardize[s] . . . [the] vital interests . . . of every country that offers rewards for information, including this country." *Guevara v. Republic of Peru*, 468 F.3d 1289,

16

1303-04 (11th Cir. 2006).[2] Failing to recognize jurisdiction here rewards Kenya's decision to default on its promise to pay Odhiambo for the valuable information he provided at great risk to himself. It thereby threatens the interests of all countries, including our own, to encourage disclosure of information that may be critical to effective enforcement of the law against threats ranging from tax evasion to terrorism.[3]

I believe finding a direct effect on these facts is warranted and so, respectfully, dissent.

---

[2] The court eventually found no "direct effect" in the United States of the reward contract in *Guevara*, but did so, not for lack of contractual designation of the United States as the place of performance, but because Guevara was in the United States as "'an immediate consequence' of his criminal activity, not of Peru's offer of a reward for Montesinos's capture." *Guevara v. Republic of Peru*, 608 F.3d 1297, 1310 (11th Cir. 2010).

[3] Reward contracts are an important source of valuable information for governments around the world, and there are strong reasons to believe that they should be enforceable, and be understood as such by people who might respond to them. The U.S. Department of State, for example, runs a "Rewards for Justice" program that currently offers a reward of up to $25 million for Ayman al-Zawahiri (the current head of al-Qaeda), among others. *See* Rewards for Justice, Most Wanted, http://www.rewardsforjustice.net/english/most-wanted/all-regions.html (last visited Aug. 12, 2014). The United States additionally offers rewards pursuant to the False Claims Act, and the Internal Revenue Service, Securities and Exchange Commission, and Commodity Futures Trading Commission also administer rewards programs. According to a 2012 news report, the biggest reward paid at that point was $104 million by the IRS for to a bank employee who, like Odhiambo, provided information on tax evasion. *See* David Kocieniewski, *Whistle-Blower Awarded $104 Million by I.R.S.*, N.Y. Times, Sept. 12, 2012, at A1.